STATE OF ALABAMA ex rel. William J. BAXLEY, Attorney General, and William J. Baxley, Attorney General, Plaintiffs,

v.

CORPS OF ENGINEERS OF the UNITED STATES ARMY et al., Defendants,

and

Tombigbee River Valley Water Management District, Intervening Defendant.

No. CA75–H–2343–J.

United States District Court,
N. D. Alabama,
Jasper Division.

April 14, 1976.

William J. Baxley, Atty. Gen., James R. Cooper, Jr., H. H. Caddell, Asst. Atty. Gen., Montgomery, Ala., for plaintiffs.

Shirley McCarty, Bill L. Barnett, Charles Perry, Asst. U. S. Attys., Birmingham, Ala., for defendants.

Fred M. Bush, Jr., Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, Miss., for intervening defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HANCOCK, District Judge.

On December 31, 1975, plaintiffs filed a complaint herein seeking, among other things, a preliminary injunction against the Corps of Engineers of the United States Army, Martin R. Hoffman, Acting Secretary of the Army, Lt. General W. C. Gribble, Jr., Chief of Engineers, Corps of Engineers, and Col. Drake Wilson, District Engineer, Mobile District, Corps of Engineers, prohibiting them from taking any steps toward the channelization of Luxapalila Creek,[1] a tributary of the Tombigbee River. The complaint chiefly predicates its prayer for relief on:

1. The alleged failure of the defendants to comply with § 102(2)(B) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332, by not properly consulting with the Council on Environmental Quality in the decisionmaking process;

2. The alleged failure of the Environmental Impact Statement prepared for the channelization project of Luxapalila Creek to comply with subparts (i), (iii), (iv) and (v) of § 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332, including also the alleged failure to consult with all federal agencies with environmental expertise prior to making an Environmental Impact Statement; and,

3. The alleged arbitrary and capricious action of defendants in making the decision to implement the full channelization project of Luxapalila Creek, as exemplified

(a) by their decision so to do prior to a good faith consideration of environmental information developed for the Environmental Impact Statement;

(b) by the unlawful use by defendants of a 3% interest rate in the Environmental Impact Statement in calculating the cost/benefit ratio contained therein to support the project;

(c) by the failure of defendants to include in the cost/benefit analysis in the Environmental Impact Statement any consideration of the environmental losses resulting from the project, including specifically the total destruction of hunting, fishing, canoeing and other recreational activities;

(d) by the utilization by defendants of hearsay, outdated data and other unreliable information in calculating the benefits to be derived from the project for use in the cost/benefit ratio;

(e) by the use by defendants of an unrealistically long 50-year estimate of the life of the project when two prior channelization projects of the same creek had useful lives of less than 30 years; and,

(f) by the failure of defendants to choose available alternative proposals

---

1. On many maps the creek is spelled Luxapalilla but the spelling appearing on maps published by the United States Department of Interior will be used herein.

which would have minimized environmental harm.

The matter was set down for a hearing and on February 12, 23, 24 and 25, 1976, the court received evidence offered by the parties. At the commencement of the hearing on February 23, 1976, defendant Tombigbee River Valley Water Management District sought to intervene as a defendant, which intervention was allowed. All the parties have filed excellent briefs and the matter is now ripe for a decision on the requested preliminary injunction.

The action contemplated by defendants and challenged here involves channel excavation and the clearing of the banks along a total of 19.9 [2] miles of Luxapalila Creek, beginning at a point where the creek joins the Tombigbee River. Approximately three-fourths (15.2 miles) of the channel will be in Lowndes County, Mississippi, and approximately one-fourth (4.7 miles) of the channel will be in Lamar County, Alabama. Over 1,200 acres are to be cleared, which clearing will consist of the removal of all growth (except a few isolated trees) from a strip varying in width from 300 feet to 900 feet along the entire 19.9 miles. Over 7,000,000 cubic yards of excavated material is to be placed in mounds no higher than 15 feet along the banks of the channel.

The project will provide flood control resulting in reduced damage to Columbus, Mississippi, urban area and agricultural lands upstream. Over 1,200 acres of streambank habitat essential to some animals and plant species will be lost indefinitely. Shade trees removed from along the banks will cause an increase in water temperature with a corresponding decline in dissolved oxygen. Many fishes of the creek will be detrimentally affected and some species,

such as the walleye, will likely be eliminated. Ever decreasing bottomland hardwoods will be cleared. Turbidity will increase.[3]

The project is designed to give flood protection against the 5-year flood in the Columbus urban area and against the 1.5 year flood in the rural areas upstream. While the defendants acknowledge that protection against the 100-year flood, or the 50-year flood, or even the 25-year flood is more desirable, the economics of the project can justify only the much lower degree of protection. The project is designed to prevent approximately $498,000 estimated annual flood damage of which $373,000 is in or near Columbus and below mile 5.6 in the creek. Of such $373,000, approximately $250,000 is estimated urban damage in Columbus which has in all probability stabilized since that city has now adopted zoning restrictions and building codes in the Luxapalila flood plain which prohibit further construction therein.

Luxapalila is the only major tributary flowing into that portion of the Tombigbee River which will become a pool created by the Aliceville Lock and Dam. When the Aliceville pool is created, it will inundate the lower 4.8 miles of the Luxapalila channelization project, including the 2.1 miles which has already been completed. Each of the neighboring pools will have a major tributary [4] left in its natural state because, as defendant Wilson explained to the Tombigbee River Valley Water Management District (see Plaintiffs' Exhibit # 7), "in order to maintain a more diverse and healthy ecosystem it may be essential to maintain a major tributary stream in its natural state flowing into each navigation pool on the Tombigbee River." Plaintiffs argue that the Environmental Impact

2. The project was begun prior to the preparation of the Environmental Impact Statement and 2.1 miles (referred to as Phase 1) of the project was completed *prior* to the preparation of the Environmental Impact Statement.

3. The summary of the Environmental Impact Statement states that "a small temporary increase in turbidity may be expected." Testimony received at the hearing characterized the

expected increase in turbidity as substantial, permanent and certain.

4. The pools created by the Upper Demopolis Lock and Dam, the Gainesville Lock and Dam and the Columbus Lock and Dam will have, respectively, the following major tributaries left in their natural state: the Noxubee River, the Sipsey River and the Buttahatchie River.

Statement is at variance with this without discussing or dealing with the need to maintain at least one major natural stream flowing into the Aliceville pool, and that the Luxapalila is the only such stream available to the Aliceville pool.

The Environmental Impact Statement (EIS) for the project was prepared in December of 1974, and the initial findings and decision thereon were made by defendant Wilson on December 27, 1974. Necessary review and concurrence with such findings were received on April 4, 1975, and on May 7, 1975. The final EIS was filed with the Council on Environmental Quality on May 30, 1975.

■ A contract for the Luxapalila channelization project has been awarded and the successful bidder is expected to commence construction immediately. In anticipation of the project, local interests have acquired necessary easements and the necessary relocation of certain roads and bridges is in various stages of completion.

Jurisdiction of this court is properly invoked under 28 U.S.C. § 1331. Defendants argue that plaintiffs have no standing to bring this action because there is no "case or controversy" between plaintiffs and defendants. But the complaint alleges that the citizens of the State of Alabama use Luxapalila Creek and that the State of Alabama has an interest in protecting its fish and wildlife populations from destruction by the activities of defendants. Section 229 of Title 55 of the Code of Alabama expressly authorizes the attorney general to institute actions necessary to protect the rights and interests of the state. The court is therefore of the opinion that the State of Alabama, ex rel. William J. Baxley, Attorney General, has the requisite standing to bring this action. *State of Florida ex rel. Shevin v. Exxon Corporation,* 526 F.2d 266 (5th Cir. 1976); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

The issues presented by plaintiffs' request for a preliminary injunction are:

1. Is there a substantial likelihood that plaintiffs will prevail on the merits?

2. Is there a substantial threat that plaintiffs will suffer irreparable injury if interlocutory injunctive relief is not granted?

3. Does the threatened injury to plaintiffs outweigh the threatened harm the injunction may do to defendants?

4. Will the granting of a preliminary injunction disserve the public interest?

■ There is little room to argue against the proposition that the citizens of the State of Alabama, as well as the citizens of the State of Mississippi, would suffer substantial irreparable injury if the project were unlawfully constructed. Neither the defendants nor this court could repair the injury or properly compensate for it if construction proceeded and this court later were to hold that plaintiffs are entitled to the relief prayed for. While a delay in the project may well cause the cost of the project to increase and may well prolong the injury from flooding which for years has afflicted the lands surrounding Luxapalila Creek, the magnitude and irreparability of the injury to plaintiffs far outweigh the threatened harm an interlocutory injunction might do to defendants and to those persons residing along Luxapalila Creek. Moreover, the court is satisfied that should plaintiffs otherwise be entitled to interlocutory injunctive relief, the granting of such relief will clearly serve, rather than disserve the public interest.

■ The real issue, then, facing the court is whether there is a substantial likelihood that plaintiffs will prevail on the merits. While plaintiffs have taken a rather broad swing at the Environmental Impact Statement and at defendants' decision predicated thereon to implement the channelization of Luxapalila Creek, the evidence received thus far during these proceedings and the briefs filed by the parties reflect that the most substantial grounds upon which plaintiffs might ultimately prevail are those grounds directed at the alleged

failure properly to calculate and present project costs and project benefits and those grounds directed at the alleged failure to present adequately in the EIS (and the resulting failure of the decisionmaker to consider) available alternative proposals. These grounds not only challenge the validity of the EIS but also challenge as arbitrary and capricious decisions made on such an invalid EIS. Specifically plaintiffs claim that the EIS is grossly inadequate because (1) defendants used an illegal 3% interest rate in calculating project costs rather than the legal rate of 5⅞% (2) defendants failed to include in project costs any quantification of environmental losses, and (3) defendants failed to provide in the EIS sufficient information concerning available alternatives in general and alternative number 4 in particular, to enable the decisionmaker and the public to understand and evaluate properly such alternatives. Defendants argue that such areas are not appropriate areas for judicial review, but *Montgomery v. Ellis,* 364 F.Supp. 517 (N.D. Ala.1973), amply demonstrates that this court has not only the right but the duty to review such matters and any decisions predicated thereon which may be arbitrary or capricious. See also, *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974), and *Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army,* 492 F.2d 1123 (5th Cir. 1974). But while this court's inquiry into the facts is to be searching and careful, it cannot substitute its judgment for that of the agency, and this court thus may only consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

### The National Environmental Policy Act

Congress, in enacting the National Environmental Policy Act of 1969 (NEPA), established a clear mandate to all federal agencies to consider environmental factors substantively in the decisionmaking process. The declaration of national policy towards the environment is explicitly stated in § 101 of the Act, 42 U.S.C. § 4331.

Section 102 of the Act, 42 U.S.C. § 4332, established procedural requirements to give effect to the policy declarations expressed in § 101. Under those procedural requirements, all federal agencies, including the Corps of Engineers, must, to the fullest extent possible, consider and give appropriate weight to environmental factors in decisionmaking.

The "detailed statement" required by § 102(2)(C) of the Act serves at least three fundamental purposes. First, it provides assurances to the Congress, the President, the CEQ, and the public that the agency involved has made a good faith effort to consider the environmental amenities that NEPA is designed to safeguard. The courts have held that to accomplish that end, the statement must "explicate fully its course of inquiry, its analysis, and its reasoning." *Silva v. Lynn,* 482 F.2d 1282 (1st Cir. 1973). Second, NEPA has been properly characterized by the courts as "an environmental full disclosure act." An Environmental Impact Statement therefore must be organized and written in language understandable by the general public and at the same time contain sufficient technical and scientific data to alert specialists to particular problems within their expertise. Third, and perhaps most important, the "detailed statement" requirement of § 102(2)(C) helps insure the integrity of the agency's decisionmaking process. Thus, the courts have held that an adequate "detailed statement" serves to counter agency bias in favor of a project that the agency has recommended and to preclude sweeping under the rug serious environmental problems. See, e. g., *Silva v. Lynn, supra; Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289 (8th Cir. 1972).

In *Environmental Defense Fund v. Corps of Engineers (Tombigbee),* 492 F.2d 1123 (5th Cir. 1974), the Fifth Circuit held that "the detail required is that which is sufficient to enable those who did not have a part in its compilation to understand and

consider meaningfully the factors involved." See also, *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App. D.C. 33, 449 F.2d 1109, 1114 (1971).

### Quantification of Environmental Losses

Section 102(2)(B) of NEPA requires that, to the fullest extent possible, an agency shall identify and develop methods and procedures, in consultation with CEQ, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration along with economic and technical considerations. This court recognizes that while § 102(2)(B) does not require agencies to do the impossible, it does require, and the courts have so held, that a good faith effort be made by the agency to weight and weigh ecological factors in making the ultimate decision to proceed with the project. *Environmental Defense Fund v. Corps of Engineers (Tombigbee), supra.*

Plaintiffs take the position that NEPA requires that all environmental losses must be quantified in terms of dollars in an EIS which is presenting to the decisionmaker and the public an analysis of the costs and the benefits of a particular project. Defendants, on the other hand, take the position that NEPA does not require environmental losses to be quantified in terms of dollars or in any other terms but simply requires a full disclosure of environmental consideration. A substantial amount of litigation embracing the issues presented by these diverse views has occurred during recent years. See "Cost-Benefit Analysis in the Courts: Judicial Review Under NEPA," 9 Ga.L.Rev. 417 (1975). The court decisions resulting from that litigation reflect that neither view urged upon this court is completely correct.

Recognizing that NEPA does not demand that every federal decision be verified by the reduction of environmental amenities to mathematical absolutes for insertion into a precise formula, *Sierra Club v. Lynn,* 502 F.2d 43 (5th Cir. 1974), this court nonetheless is of the opinion that where it is reasonably possible to quantify environmental amenities, NEPA requires not only that such amenities be quantified but that they be included in the cost/benefit analysis.[5]

Thus this court is of the opinion that NEPA requires a cost/benefit analysis in an EIS; that environmental as well as non-environmental factors must be included in that analysis on each side of the ledger; that where these factors (environmental and non-environmental) are reasonably susceptible of being quantified in economic terms (dollars), such must be done; that where a particular factor (environmental or non-environmental) is not reasonably susceptible of being quantified in economic terms but is reasonably susceptible of being quantified in terms other than economic, such must be done; but that where a particular factor (environmental or non-environmental) is not reasonably susceptible of being quantified in any terms, economic or otherwise, all that the cost/benefit analysis requirement mandates is a full disclosure of that factor in a manner sufficient to permit the decisionmaker to weigh that factor, be it benefit or burden, with the other factors which are susceptible of quantification. The reason for the foregoing is obvious when one recognizes that NEPA requires that environmental costs and benefits be compared with other project costs and benefits, including economic costs and benefits. Thus an optimal comparison can only be made if there exists a common denominator to which various factors may be reduced.

5. The cost/benefit analysis required by NEPA is not to be confused with cost/benefit ratios customarily used under public works legislation, such as the Flood Control Act of 1958, Public Law 85–500, which authorizes this project. Public works legislation normally requires "parity" of costs and benefits before the Congress will appropriate funds to a federal agency, such as the Corps. NEPA contains no such "parity" mandate. Thus, it is conceivable that a project could satisfy the cost/benefit analysis required by NEPA while not satisfying the "parity" requirements (usually discussed in terms of one-to-one cost/benefit ratios) for funding.

To the extent that environmental amenities are quantifiable and reducible to monetary terms, along with the claimed economic amenities, the decisionmaker is better able to compare values and comply intelligently with the mandate of NEPA.

■ Based upon a review of the EIS prepared for the Luxapalila channelization project and upon the pleadings and upon the documentary evidence and oral testimony received during the hearing on the requested preliminary injunction, it is apparent that there are significant environmental amenities associated with the Luxapalila project which are capable of being quantified in economic terms and being included in the cost/benefit analysis which were not so quantified and included. The absence of that information, particularly in view of the evidence hereafter discussed tending to show the magnitude thereof and indicating substantial inaccuracies in the information regarding recreational losses which was before the decisionmaker, causes this court to conclude that there is a substantial likelihood that plaintiffs will prevail upon the merits in this action. Moreover, the failure to quantify recreational losses in monetary terms and to include such information in the cost/benefit analysis was not a simple oversight. The Board of Water Commissioners of the State of Mississippi expressly commented upon the absence in the draft EIS of the information. See pages 81–82 of the EIS.

The Corps takes the position that even if it is required to quantify environmental amenities it has done so in the EIS within both the letter and spirit of NEPA. Thus, for example, ¶ 4.23 of the EIS points out that the project will cause an annual loss of 3,500 man-days of stream fishing and 350 man-days of waterfowl hunting capacity. Paragraph 4.23 notes a reduction (without stating how significant a reduction) in the present "capacity" for 6,500 man-days of small game hunting and a reduction in fur harvest which harvest in 1967 had a $500 value. Paragraph 4.23 also notes the probable elimination of walleye, a game fish which the Mississippi Game and Fishing Commission has successfully established in the Luxapalila. No effort is made to quantify the walleye loss or determine amounts the Mississippi Game and Fishing Commission had expended establishing the population. Except for the 1967 valuation of $500 for fur harvest lost, no effort was made in the EIS to quantify in economic terms any of the foregoing. The source of the foregoing figures was a 1967 letter from the United States Department of the Interior to the Corps (Defendants' Exhibit # 7). The 1967 letter also noted that a few deer inhabited the area. No effort was made by the Corps to upgrade the 1967 data thus received from the Department of Interior and the Corps included the information in the EIS as presented to it in 1967.

Mr. Ralph Allen, Chief of the Game Management Section of the Alabama Department of Conservation testified during the hearing that he had conducted first-hand studies of Luxapalila and had directed other studies to be made by members of his staff. Such studies revealed that the *Alabama portion alone* of Luxapalila has a current annual usage of 3,500 man-days of stream fishing, 500 man-days of waterfowl hunting, 790 man-days of small game hunting and 1,500 man-days of big game hunting (primarily deer). Such data for the Alabama segment alone compels this court to conclude that, upon a final hearing of this case, it may well develop that the man-days of fishing and hunting which will be lost by the implementation of the project, as set forth in ¶ 4.23 of the EIS, represent only a fraction of the actual annual losses which, had the Corps investigated rather than relying upon the 1967 letter from the United States Department of the Interior, could have been easily discovered and included in the EIS. The same can be said for the estimated $500 annual reduction in the fur harvest reflected in the EIS in view of Mr. Allen's testimony that on the Alabama segment alone there are 600 man-days of fur trapping annually, valued by him at $25 per man-day.

██ Of equal, if not more significance than the foregoing is the failure of the EIS to quantify in economic terms and include in the cost/benefit analysis for the decisionmaker certain environmental amenities which were included in the EIS *and which all parties agree are capable of reasonable quantification in economic terms.* Defendants acknowledge that the annual man-days lost to stream fishing and hunting can be readily quantified in economic terms and point to pages 81 and 82 of the EIS where figures appear which can be translated into valuations for a day of fishing at $1, a day of waterfowl hunting at $3, and a day of small game hunting at approximately $2. Apart from the question whether the disclosure of such figures in response to a comment on a draft of the EIS is sufficient to satisfy the obligation to include in a cost/benefit analysis in an EIS environmental factors quantified in economic terms where, as here, they are reasonably susceptible of quantification in such terms, the court is of the opinion that the values there assigned may be so unreasonably low and so arbitrarily selected as to fail to satisfy NEPA. Col. Drake Wilson and Mr. Skeeter McClure of the Mobile District of the Corps both testified that these values were derived from a 1964 document entitled Supplement No. 1 to Senate Document No. 97, 87th Congress, 2d Session, entitled Evaluation Standards for Primary Outdoor Recreation (Defendants Exhibit # 12). Both Col. Wilson and Mr. McClure stated that they felt obligated, as a matter of law, to use the figures set forth in such 1964 publication and could not have used any other figures even if they felt other figures were more realistic. The court is of the opinion that while the Corps may be obligated to use the values in such 1964 document in reporting to Congress for the limited purposes for which they were developed (i. e., standards for reporting to Congress by the Corps and other federal agencies), such 1964 document has no application to a valuation of similar matters under NEPA and that it is inappropriate for the Corps to use the values therein contained in an EIS unless they are in harmony with current values.

As pointed out earlier, the Corps made no effort to determine current values for a day of recreation, mistakenly believing it was bound as a matter of law to the 1964 valuations of $1 for a day of fishing, $3 for a day of waterfowl hunting and $2 for a day of small game hunting. The testimony of Col. Wilson and Mr. McClure demonstrate how out-of-date these figures are. They both testified that the figures *included* the costs of as much as 50 miles transportation which clearly in 1974 could not be supplied by $1, or $2 or perhaps even $3.

During the course of the hearings, plaintiffs presented impressive expert testimony relating to quantification of environmental amenities. Dr. Henry N. McCarl, an economist with considerable experience in analyzing the economics of projects affecting the environment, testified that man-days of fishing, hunting and recreation are readily susceptible to dollar valuation. Dr. McCarl testified that there is an accepted range of monetary values applicable to environmental factors. He testified that his studies of the literature reveal that there exists among economists the following ranges: for fishing, $5 to $10 per man-day; for small game hunting, $10 to $20 per man-day. The specific dollar values assigned to a project would depend upon various factors peculiar to that project. Factors considered would be: the desirability of the species of fish or game sought; the fishing and hunting pressure in the area; and, the availability of alternative sites to the public. He further testified that the Alabama Department of Conservation would be a proper source of specific values for the Luxapalila Creek area. He characterized the values assigned by the defendant to the instant project as "totally unrealistic."

As stated earlier, Mr. Ralph Allen, the Chief of the Game Management Section of the Alabama Department of Conservation, testified that his studies reflected that the Alabama segment of Luxapalila Creek has a current usage of 3,500 man-days of stream fishing, valued at $10 per man-day; 500 man-days of waterfowl hunting, valued

at $15 per man-day; 790 man-days of small game hunting, valued at $12 per man-day; 1,500 man-days of big game hunting (deer), valued at $17 per man-day; and 600 man-days of fur trapping, valued at $25 per man-day. The effect of Mr. Allen's testimony is that the environmental losses *to the Alabama segment of the project alone* would exceed $90,000 per year, none of which is recognized in the final EIS submitted by the defendants on the Luxapalila Creek project and was before the decisionmaker. This loss alone equals 13% of the annual benefits of the entire project. Needless to say, the Mississippi section of the creek in all probability has a substantially larger loss of recreational days.

This action is not before this court for a final decision, and it is apparent from the foregoing that significant issues of fact must be developed and resolved before any such final decision can be made. But, as indicated earlier, a record has been developed which compels this court to conclude that there is a substantial likelihood that plaintiffs will prevail upon the merits in this action on the basis of their challenge directed at the EIS for its failure to quantify properly environmental losses and to include them in project costs so that they could be analyzed and evaluated by the decisionmaker prior to making his decision.

*Interest Rate Applicable to the Project*

Plaintiffs have mounted a strong challenge to the legality of the 3% interest rate used by the Corps of Engineers in the project, alleging that the interest rate is unrealistically low. See *Montgomery v. Ellis,* 364 F.Supp. 517 (N.D.Ala.1973). But subsequent to *Montgomery,* Congress enacted the Water Resources Development Act of 1974, Public Law 93–251 (March 7, 1974), 88 Stat. 12, § 80 of which now governs the interest rate applicable to the Luxapalila Creek project.

Section 80(a) of the Water Resources Development Act of 1974, 42 U.S.C. § 1962d–17(a) contemplates that the interest rate to be used by federal agencies in any given fiscal year is to be an interest rate equal to the average yield during the preceding fiscal year of government securities having maturity dates of 15 years or more, all as determined by the Water Resources Council. The Water Resources Council determined that the interest rate to be used by federal agencies, such as the Corps, during the fiscal year 1975 was 5⅞%. See 39 C.F.R. 29242. Thus, if § 80(a) is applicable to this project, the Corps of Engineers is required to use a rate of 5⅞%, rather than the 3% rate which it used.

However, such Act contains a "grandfather clause," § 80(b), 42 U.S.C. § 1962d–17(b), which states that an alternate interest rate may be used if two conditions have been met: (1) the project must have been authorized before January 3, 1969, and (2) the appropriate non-federal interests, prior to December 31, 1969, must have given "satisfactory assurances" to pay the required non-federal share of project cost. The critical question here is whether these two conditions have been met so that § 80(b) of the Water Resources Development Act of 1974 applies to the Luxapalila project.

Both parties concede that the project was contained in the Flood Control Act of 1958, Public Law 85–500, adopted July 3, 1958, 72 Stat. 297, and was therefore authorized by Congress prior to January 3, 1969. There is, however, substantial argument over whether the non-federal interest in the State of Alabama gave to the Corps of Engineers prior to December 31, 1969, legally sufficient "satisfactory assurances" to pay the required non-federal share of the project costs.[6] Resolution of this question turns upon the interpretation of the phrase "satisfactory assurances" as used in § 80(b).

6. The court here expresses no opinion concerning the adequacy of the assurances given the Corps of Engineers by the non-federal agencies in Mississippi.

The defendant argues that the phrase "satisfactory assurances" is entirely subjective and therefore involves a judgment committed to agency discretion by law, and not subject to judicial review. But see *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). To support its argument defendants cite the court to several cases interpreting similar words as used in other statutes. But the cases cited by defendants are based upon federal statutes which contain common provisions critical to those decisions, and not present in this case. In each case cited by the defendants the applicable federal statute expressly required that the assurances be given *to a specified public official to whom those assurances must be satisfactory.* For example, in *Akers v. Resor,* 339 F.Supp. 1375 (W.D.Tenn.1973), an environmental group was attempting to enjoin a channelization project by the Corps of Engineers. The plaintiff there argued that local agencies had not given satisfactory assurances to supply support for the project. However, the applicable federal statute, 33 U.S.C. § 701c, provided that no money could be expended by the federal agency on that particular project until the local agencies had "given assurances *satisfactory to the Secretary of the Army* . . .." (Emphasis added). The statutory language in the instant case is not so definitive or restrictive.

■ The phrase "satisfactory assurances," as used in § 80(b), is used in a general, nonspecific sense and vests no particular public official with the authority to make a determination of precisely what degree of assurances is required in order to be considered "satisfactory." Thus the phrase is to be tested by an objective standard rather than a subjective standard of a particular public official.

The word "assurances" clearly has a definitive connotation and involves a concept readily amenable to objective analysis. The American College Dictionary defines the word "assurance" as expressing "a positive declaration intended to give confidence; pledge, guaranty, surety." Webster's Third New International Dictionary defines the word "assurance" as "the quality or state of being sure or certain." The words "pledge" and "guarantee" are often listed as synonyms. Black's Law Dictionary defines the word "assurance" as "a pledge, guaranty or surety." Even when "assurance" is modified by the adjective "satisfactory" and thereby given a subjective gloss, the phrase "satisfactory assurances" still retains an essentially objective character.

The defendants' contention that it received satisfactory assurances from the Alabama non-federal interests prior to December 31, 1969, is based entirely on a resolution adopted by the Tombigbee Valley Development Authority at the corporation's organizational meeting on April 18, 1968. The resolution pledged the full cooperation of TVDA to the flood control projects authorized by the Flood Control Act of 1958 and granted assurances that it would, among other things, contribute the cash required by Alabama interests.

■ The TVDA is a public corporation created by the Alabama legislature in 1967 and given the authority to fulfill the requirements of local contribution in connection with the Tennessee-Tombigbee waterway development and federal flood control projects on tributaries of the Tombigbee. See Code of Alabama of 1940, Title 38, Sections 126(1)–126(15). TVDA was empowered to issue and sell general obligation bonds up to a principal amount of $10,000,-000. Id. § 126(12). However, the Alabama legislature closely restricted the power of TVDA to incur legally binding obligations. Thus TVDA was expressly prohibited from incurring any monetary obligations which exceeded the sum of (a) any uncommitted funds already appropriated to TVDA and (b) any uncommitted proceeds of bonds available to TVDA, and the board of directors of TVDA was expressly directed not to approve any contract involving expenditure of money without specifically finding that the contract would not cause TVDA to violate such express prohibition. Id.

§ 126(9). The parties agree that at no time prior to 1974 had the issuance and sale of any bonds been authorized under § 126(12) and that at no time has there been an appropriation of funds to TVDA. Stated another way, it is undisputed that any monetary obligation of TVDA assumed prior to 1974 would be in violation of the powers of TVDA as expressed in § 126(9). Therefore, upon a final hearing herein, this court may well conclude that, applying an objective standard, the kind of "satisfactory assurances" contemplated by § 80(b) of the Water Resources Development Act of 1974 could not have been given by TVDA prior to December 31, 1969, and that the interest rate for the project must be computed under § 80(a), i. e., 5⅞%, rather than the 3% rate defendants claim they are entitled to under § 80(b).[7]

As indicated earlier, however, the defendants argue that the term "satisfactory assurances" should be judged by a subjective standard as applied by the district engineer of the Corps. But any assurances given by the resolution adopted by TVDA on April 18, 1968, may not even be satisfactory upon proper application of a subjective standard, i. e., the acceptance thereof as "satisfactory" may be an abuse of agency discretion. On June 16, 1967, the Corps promulgated Regulation No. 405-2-680 to provide guidance to division or district engineers concerning the procurement and acceptance of assurances from local agencies under other provisions of law which require the Corps to act only after assurances satisfactory to the Corps have been received. The regulation provides, in pertinent part, that the district engineer is to make the determination of satisfactory assurances and adds the following three requirements: "It is therefore, essential that the legal authority of the local agency be thoroughly investigated and that a firm determination be made that the agency has *full legal authority,* under local laws, to give assurances. It must be established that the local agency is *financially responsible for the fulfillment of all required local cooperation.* Finally, the written assurances must be in strict compliance with the pertinent Acts of Congress and the instrument or instruments constituting the assurances must be *legally sufficient.*" (Emphasis added). TVDA certainly had no authority to make a financial commitment prior to 1974, much less as of December 31, 1969; TVDA was certainly not financially responsible prior to 1974; and more importantly, the April 18, 1968, resolution cannot be considered legally sufficient. Thus, upon a final hearing herein, this court may well determine that any discretion associated with the acceptance of assurances from TVDA was so improperly exercised as to be judicially reviewable.

■ In any event, there is at this point in these proceedings a substantial likelihood that plaintiffs will prevail upon the merits in this action on the basis of their challenge directed at the use by defendants of a 3% interest rate, producing interest costs of the project at $330,000 per annum, rather than a 5⅞% interest rate, which would translate into annual interest costs of the project at $647,000. The addition of the $317,000 interest costs to the presently stated $481,000 total project costs would be so overwhelming as to require the decisionmaker to review and reconsider his decision. Indeed, such additional annual interest costs may destroy the "parity" required by the Flood Control Act of 1958 before the project may be implemented.

### Presentation of Available Alternatives in the Environmental Impact Statement

■ Section 102(2)(C) of NEPA requires all federal agencies, including the Corps of

---

7. Even if defendants are entitled to a rate under § 80(b), there still remains substantial doubt as to the correctness of the 3% interest rate used by the defendants. See 39 C.F.R. 29242, Water Resources Council, Standards for Planning Water and Related Land Resources. Regulation 3(e) of that regulation provides that: ". . . the discount rate to be used in plan formulation and evaluation for the fiscal year 1969 shall be 4⅝% except as provided by paragraph (d) of this section."

Engineers, to include as part of the EIS, a detailed statement on alternatives to the proposed agency action. This requirement is not satisfied merely by including a list of alternatives. Indeed, § 102(2)(E) expressly requires all federal agencies to *study, develop, and describe* appropriate alternatives to the proposed action. And while § 102(2)(E) does not require the agency to do the impossible or to study and develop alternatives of little practical significance, it does require the agency to make a good faith effort to study and develop fully those alternatives reasonably calculated to reduce environmental harm while at the same time achieving major portions of the goals sought to be accomplished by the proposed action. Moreover, such alternatives should not be limited solely to those measures the agency has the authority to implement, but should be wide ranging and incorporate those reasonable alternatives capable of implementation either by other federal agencies or by the private section. *Sierra Club v. Lynn,* 502 F.2d 43 (5th Cir. 1974); *Montgomery v. Ellis, supra.* So that the decisionmaker may be in a position to make an informed decision, the EIS must include in its discussion of such alternatives the results of the agency's own investigation and valuation of those alternatives. See, e. g., *Environmental Defense Fund v. Froehlke,* 473 F.2d 346 (8th Cir. 1972).

■ The policy of NEPA furthered by the foregoing requirement is that those entitled to receive information are entitled to have all information pertinent to the agency's decision choosing one alternative over another. It is not enough that someone within the agency has considered and evaluated available alternatives; the information must be explicated within that section of the EIS devoted to the discussion of alternatives, and must contain sufficient data to indicate that the agency decision was not arbitrary or capricious. The explicit mandate of NEPA that all federal agencies "consider" environmental amenities in the decisionmaking process would be effectively eviscerated if there were no complementary requirement to consider fully and analyze those alternatives which may have the effect of avoiding environmental costs while still accomplishing the project's objective.

■ Alternatives which have been held to be appropriate alternatives in connection with a flood control project include (1) flood plain zoning; (2) crop insurance; (3) plans which included various combinations of diversions, water reservoirs, flood waves, interceptor ditches and levees. See *Environmental Defense Fund v. Froehlke, supra.* While one or two of these alternatives are given nominal treatment in the EIS filed in this case, others are not mentioned at all. For example, the EIS notes the existence of flood plain zoning adopted in the Columbus, Mississippi area, yet there is little or no discussion of the environmental effects of the zoning ordinances on the several alternatives that were considered, and the EIS contains no discussion whatever of the possible use of crop insurance for the rural flood plain, an alternative required of the Corps in similar flood control projects. See *Montgomery v. Ellis, supra.* Similarly, Dr. George W. Folkertz testified that the major cause of rural flooding along Luxapalila Creek is the pooling of water in fields caused by a destruction over a number of years of the natural water course drainages, suggesting that a simple restoration of these natural drainages would allow the pooled water to drain into the creek. Neither this problem, nor its solution, is referred to in the EIS.

The court is particularly concerned with the summary treatment given to alternative 4 in the EIS. Alternative 4 would involve channelizing Luxapalila Creek from the Tombigbee River to mile 6.3, which is upstream from the City of Columbus Waterworks. This alternative apparently would provide complete relief and protection for the urban area around Columbus, Mississippi, where the greatest economic benefits are claimed, and would leave the remainder of the stream in its natural state. Col. Wilson testified that he considered alternative 4 to be an extremely viable alter-

native, and that had the Governor of the State of Alabama asked the Corps to implement alternative 4 rather than the proposed project, the Corps most likely would have complied with the request. Yet, other than as a line item in Table 11, only a portion of one paragraph (6.09) of the EIS is devoted to a discussion of alternative 4. Similarly, the testimony developed during the hearing clearly indicates that the overwhelming portion of the adverse environmental effect of the entire project occurs upstream from mile 6.3; but the EIS lacks information from which the decisionmaker or the public can allocate these environmental losses above and below mile 6.3 and thereby compare alternative 4 with the course of action sought to be pursued.

It is simply impossible for this court to conclude that the decisionmaker had before him in the EIS the results of the studies required to be developed by § 102(2)(E) of NEPA, containing the detailed statement of alternatives mandated by § 102(2)(C). Indeed, the entire EIS appears to have been prepared from the following point of view—a decision to channelize 20 miles of the creek and thereafter the preparation of an EIS to reflect this decision and to list alternatives which could have been considered. Such is not what NEPA contemplates. NEPA envisions that the first step should be a decision to reduce flood damage and thereafter the preparation of an EIS which fully explores and articulates appropriate alternative ways to reduce the flood damage, giving appropriate weight to environmental factors. Thereafter, and based thereon, the decisionmaker selects the method to reduce the flood damage, keeping in mind the environmental policy of this nation as articulated by the Congress through NEPA.

Because of the cursory treatment accorded the alternatives considered in the EIS, there is a substantial likelihood that plaintiff will prevail upon the merits in this action on the basis of their challenge directed at the EIS for its failure to include sufficient information concerning available alternatives.

*Conclusion*

As stated at the outset, the real issue facing the court by plaintiffs' request for a preliminary injunction is whether there is a substantial likelihood that plaintiffs will prevail on the merits. The court has indicated herein that there is a substantial likelihood that the EIS fails to satisfy NEPA for three separate reasons. Should plaintiffs prevail herein for any one of such reasons, the EIS would be so defective as to make any decision predicated thereon arbitrary, capricious, and not in accordance with law. Stated another way, this court is of the opinion that there is a substantial likelihood that the decision to channelize Luxapalila Creek was made without the benefit of significant, material factors, was predicated upon incorrect assumptions of law, and was a clear error of judgment. The other elements necessary for the issuance of a preliminary injunction also being present as aforesaid, an appropriate order will be entered.

Rule 65(c) of the Federal Rules of Civil Procedure requires security to be given by the applicant for a preliminary injunction before such injunction may issue. But it is not uncommon, in public interest actions such as the instant one, to require only nominal security under Rule 65(c). *Natural Resources Defense Council, Inc. v. Morton,* 337 F.Supp. 167 (D.D.C.1971), aff'd on other grounds, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972) (security of $100 required in face of $750,000 to several millions of dollars' damages claimed to result by injunction affecting leasing operations on continental shelf); *Powelton Civic Home Owners Association v. Department of Housing and Urban Development,* 284 F.Supp. 809 (E.D.Penn.1968) (no security required in face of requested $20,000,000 security where defendants enjoined from disbursing federal funds). See also *Bass v. Richardson,* 338 F.Supp. 478 (S.D.N.Y.1971) (no security required); *West Virginia Highlands Conservancy v. Island Creek Coal Company,* 441 F.2d 232 (4th Cir. 1971) (no security required); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 331 F.Supp. 925 (D.D.C.1971) ($1.00

security to support order enjoining construction of Tennessee-Tombigbee Waterway project); *Sierra Club v. Froehlke,* 359 F.Supp. 1289 (S.D.Texas 1971) ($100 security to support order terminating construction of two major hydro projects on or near the Trinity River).

This court is simply unwilling to close the courthouse door in public interest litigation by imposing a burdensome security requirement on plaintiffs who otherwise have standing to review governmental action. The decision to require only nominal security in such situations is appropriately a matter to be weighed by the court in its consideration of the basic issues which a court must consider in passing upon a request for interlocutory injunctive relief, namely, likelihood that plaintiff will prevail, presence of substantial threat of irreparable injury to plaintiff, balancing threatened injury to plaintiff and threatened harm to defendant, and considerations of public interest. Accordingly, the injunction to be issued will be conditioned upon the giving of security in the amount of one dollar.

### PRELIMINARY INJUNCTION

In accordance with the Findings of Fact and Conclusions of Law this day entered, it is hereby

ORDERED, ADJUDGED and DECREED that, pending an order entered on final hearing of this cause or further order of this court, the defendants Martin R. Hoffman, Acting Secretary of the Army; Lt. General W. C. Gribble, Jr., Chief of Engineers, Corps of Engineers, United States Army; and Col. Drake Wilson, District Engineer, Mobile District, Corps of Engineers, United States Army; their respective successors in office; and their officers, agents, servants, employees, attorneys and all persons acting on their behalf, as well as all persons in active concert or participation with them who receive actual notice of this order, are hereby restrained and enjoined from taking any steps whatsoever toward further stream modification or channelization of Luxapalila Creek or implementing the project described in the Final Environmental Statement prepared by the United States Army Engineer District, Mobile, as of December 1974, entitled "Tombigbee River and Tributaries, Luxapalila Creek Segment, Alabama and Mississippi."

It is further ORDERED that there is expressly excluded from the operation of this injunction all activity directly related to the construction, repair or relocation of bridges, roads and railroad facilities associated with the Luxapalila Creek project if such activity does not include stream modification other than of a nominal nature in the immediate vicinity of the particular bridge, road or railroad facility.

It is further ORDERED that, before the injunction herein contained shall be effective, plaintiffs shall give as security a good and sufficient bond in the amount of One Dollar ($1.00) for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained, such bond to be approved by the court or by the Clerk of the court.