**LIBBY ROD & GUN CLUB et al., Plaintiffs,**

v.

**John A. POTEAT et al., Defendants,**

**and**

**Western Environmental Trade Association of Montana, Intervenor.**

**No. Cv–78–40–M.**

United States District Court,
D. Montana,
Missoula Division.

Sept. 8, 1978.

Memorandum in Support of Grant of Preliminary Injunction Sept. 28, 1978.

James H. Goetz, Bozeman, Mont., Steven J. Perlmutter, Helena, Mont.; for plaintiffs.

Robert T. O'Leary, U. S. Atty., Butte, Mont., for government defendants.

Shelton C. Williams of George, Williams & Benn, Missoula, Mont., for McMillin Bros. Constructors.

Lawrence F. Daly of Garlington, Lohn & Robinson, Missoula, Mont., for intervenor Western Environmental Trade Ass'n of Montana.

## ORDER

WILLIAM D. MURRAY, Senior District Judge.

Plaintiffs have moved, pursuant to Rule 65(a) Federal Rules of Civil Procedure, for

preliminary injunction to enjoin the defendants from proceeding with the Libby Additional Units and Reregulating Dam (LAURD) on the grounds that defendants have violated (1) 33 U.S.C. § 401 by proceeding with construction without the necessary authorization of Congress; (2) the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq., and regulations adopted thereunder; (3) the Water Resources Planning Act, 42 U.S.C. § 1962 and the Water Resources Council "Principles and Standards", 38 F.R. 24778; (4) the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq. and regulations adopted thereunder; and (5) the National Historic Preservation Act of 1966, 16 U.S.C. §§ 470–470t.

On the basis of the evidence presented and the exhibits on file herein, the court finds that the U. S. Army Corps of Engineers proposes to construct a major water development project on the Kootenai River in Lincoln County, Montana, known as "LAURD". The Corps of Engineers plans to construct four (4) additional electric power generating units of 105,000 K.W. capacity each at the present Libby Dam. In connection with the installation of the additional generating units, the Corps of Engineers plans to construct a new dam on the Kootenai River approximately ten miles downstream from the Libby Dam, the purpose of which is to hold water in order to regulate down-stream fluctuations in the water of the Kootenai River which will result from variable releases at Libby Dam. The impoundment of the reregulating dam will inundate about ten miles of the Kootenai River. The Corps of Engineers has contracted with defendant McMillin Brothers Constructors to do certain preliminary construction work, including the construction of a temporary haul bridge across the Kootenai River. McMillin Brothers has begun construction of the temporary haul bridge and is continuing to work on it. The Corps of Engineers has entered into other contracts in connection with the "LAURD" project, among them, a major contract for construction of turbines with the Allis-Chalmers Company.

On the basis of the evidence and exhibits presented at the hearing, this court finds that plaintiffs have made a sufficient showing that they are likely to succeed on the merits of the suit with respect to Counts I (Congressional Authority) and IV (N.E.P. A.). More particularly, this court finds that there is nothing in the record thus far to indicate that Congress has authorized construction of the reregulating dam. The lack of such authority constitutes a violation of 33 U.S.C. § 401. This court further finds that plaintiffs are likely to succeed on the merits of their contention that defendants have violated NEPA by failing to adequately consider alternatives to the LAURD project in the Environmental Impact Statement and Supplements.

The injury asserted by plaintiffs is both substantial and irreparable in that if Congress does not authorize construction of the reregulating dam, the injury to the environment and expenditure of public funds will be needless. The court recognizes that defendants will suffer damage as a result of this preliminary injunction. However, the damage to the environment and the importance of the public policies behind requiring Congressional authorization and adequate discussion of alternatives under NEPA on such a major water development project as LAURD are of such priority that a balancing of the resulting damage to the parties militates in favor of granting the preliminary injunction. Finally, this court finds that the public interest lies with both the plaintiffs and defendants to this action. Having considered the above interests, it is the opinion of this court that a preliminary injunction must be granted.

The court does not believe plaintiffs have made a sufficient showing of likelihood of success nor of irreparable harm as to the Endangered Species Act, Water Resources Planning Act, and the National Historic Preservation Act. However, issuance of the preliminary injunction on the other bases will have the practical effect of permitting the consultation process under the Endangered Species Act and further archeological discovery pursuant to the National

Historic Preservation Act to continue without hindrance from further construction of the LAURD project.

THEREFORE, IT IS ORDERED and ADJUDGED that the defendants, their agents, employees, assigns, and contractors, are hereby enjoined from authorizing or undertaking any actions in furtherance of construction of the "LAURD" project. This preliminary injunction specifically precludes the letting of bids to private contractors, the procuring of turbines or other equipment, and any other activities which would entail the expenditure of Federal funds and which would advance construction of the "LAURD" project. This injunction specifically does not apply to activities which are necessary in order to accomplish compliance with the law and enhancement of the environment. Examples of acts which are not hereby enjoined are further study of the Bald Eagle and its habitat in preparation for compliance with the Federal Endangered Species Act, and archeological activities designed to accomplish compliance with federal and state laws dealing with protection of antiquities. This injunction specifically does apply to various construction activities and activities designed to accomplish the construction of the "LAURD" project which cannot be characterized as environmentally enhancing, an example is the further construction of turbines in connection with the additional generating units planned for the main Libby Dam. The court makes this order with the realization that construction of the reregulating dam is necessary to avoid severe environmental damage resulting from the down-stream fluctuation in the water of the Kootenai River which will result from the operation of the additional generating units. Because the court believes that Congress has not yet authorized construction of the reregulating dam, and that the dam is necessary to the operation of the additional units, construction of such units must also be enjoined.

IT IS FURTHER ORDERED that any activities which are reasonably characterized as activities in connection with completion of the main Libby Dam and reservoir are exempted from the present injunction. In addition, Federal defendants are not enjoined from taking reasonable actions necessary to accomplish winding down of present activities which are being undertaken on the "LAURD" project. The court orders that the Federal defendants, within 15 days, of this order, submit to the court a list of activities which are necessary to accomplish a winding down of the present "LAURD" project, and also a list of actions presently undertaken which may be properly categorized as associated with construction of the main Libby Dam and reservoir as opposed to the "LAURD" project.

IT IS ORDERED that this injunction is preliminary in nature and will remain in effect pending full hearing on the question of issuance of a permanent injunction. In the interests of justice the court desired to issue this order as soon as it could. However, because of the magnitude and complexity of the issues raised, the court will supplement this order with a memorandum as soon as possible. This order for preliminary injunction shall take effect immediately.

### MEMORANDUM IN SUPPORT OF GRANT OF PRELIMINARY INJUNCTION

The project challenged in this lawsuit involves a major water development on the Kootenai River in Lincoln County, Montana, and is referred to as The Libby Additional Units and Reregulating Dam (LAURD). The Corps of Engineers plans to construct four additional electrical power generating units of 105,000 kilowatt capacity each at the main Libby Dam.[1] In connection with the installation of the additional generating units, the Corps plans to construct a new dam on the Kootenai River approximately ten miles downstream from

---

1. The main Libby Dam presently has four power generating units. The main Libby Dam received Congressional authorization in the Flood

Control Act of 1950, 64 Stat. 170, P.L. 516, 81st Cong., 2nd Sess. Construction of the main dam began in 1966 and was completed in 1973.

the main dam, the purpose of which is to hold water in order to regulate downstream fluctuations that will result from variable releases at the main dam. The reregulating reservoir will inundate approximately ten miles of the Kootenai River.

Plaintiffs have moved, pursuant to Rule 65(a) Fed.R.Civ.P. for a preliminary injunction to enjoin defendants from proceeding with construction of LAURD. The factors to be considered by a court in deciding such a motion are: (1) the likelihood that movants will be successful at a trial upon the merits; (2) the irreparable harm movant will suffer; (3) the relative balance between the damage movants will suffer without an injunction against the damage defendants will suffer from an injunction; and (4) the public interest. *King v. Saddleback Junior College District,* 425 F.2d 426, 427 (9th Cir. 1970). The court has jurisdiction of the matter pursuant to 28 U.S.C. § 1331(a), and plaintiffs' standing is established by their allegation that numerous members of plaintiff organizations would be injured by construction of the LAURD project. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Discussion of plaintiffs' allegations are set forth below in the order appearing in plaintiffs' motion.

### I. Congressional Authority

Plaintiffs allege that construction of the reregulating dam lacks congressional approval, and is therefore prohibited under 33 U.S.C. § 401.[2] This statute has been held to be a valid basis for jurisdiction in a suit filed by an environmentalist organization. *Sierra Club v. Leslie Salt Co.,* 354 F.Supp. 1099, 1105 (N.D.Cal.1972). *See also Alameda Conservation Association v. State of California,* 437 F.2d 1087, 1094 (9th Cir.), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971). Defendants maintain that Congress authorized the reregulating dam in three respects: 1) the Flood Control Act of 1950; 2) by providing continuous appropriations for the LAURD project; and 3) the General Bridge Act, 33 U.S.C. §§ 525 et seq.

Defendants' primary contention is that the reregulating dam was authorized along with construction of the main Libby Dam in the Flood Control Act of 1950. There is no mention of a reregulating dam in the language of the Act itself. However, Section 204 of the Act authorized construction of "Libby Dam, Kootenai River, Montana" and states that the project is to be ". . . substantially in accordance with the plans recommended in the report of the Chief of Engineers . . ." contained in House Document 531, 81st Congress, 2nd Session (1952). Appendix B of that report dealt with the Kootenai River Basin and described the Libby Dam and Reservoir as a proposal that included installation of six to ten power units.

The *single* reference in H.D. 531 to the possible need for a reregulating dam appears on page 464:

> "Reregulation. A sudden increase of flow from no load at minimum release to full load would raise the river stage at the dam about 15 feet. This sudden rise in stage partly would be absorbed by channel storage, decreasing in amount as its front traveled downstream. It is estimated that the maximum rise would amount to about 5 feet at the city of Libby, less than 3 feet at Troy, and less than 2 feet at Bonners Ferry. Just what effect this stage variation might have along the river is unknown at this time. However, the probable operation of the Libby generating station calls for this wide variation of load very seldom. If it becomes necessary to reduce this fluctuation, reregulation will be considered when the need arises."

From this brief reference, defendants ask the court to conclude that construction of the reregulating dam was authorized in the

---

**2.** 33 U.S.C. § 401 provides in pertinent part: "It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any . . . navigable river . . . until the consent of Congress to the building of such structures shall have been obtained . . . ."

Flood Control Act of 1950. A more appropriate interpretation of the statement is that, in 1950, the need for a reregulating dam to control fluctuation was not clearly determined: ". . . what affect [the fluctuation] might have . . . is unknown, [but it should occur] very seldom. If it becomes necessary to reduce this fluctuation, reregulation will be considered when the need arises." This hardly sounds like a positive assertion by the Corps of Engineers that a reregulating dam would have to be built. If the Corps had not yet determined the need for the dam, how could Congress have possibly authorized it?

This court's impression of events is that the Corps reported to Congress that the generating units could be built at Libby Dam without the absolute need for a reregulating dam. Congress then authorized construction of the main Libby Dam and 6 to 10 generating units in the Flood Control Act of 1950. Subsequently, the Corps discovered that the second set of 4 units could not be built without causing a serious fluctuation problem, and determined that a reregulating dam was necessary. The problem is that the Corps never bothered to secure Congress' approval for the dam, deciding unilaterally that the Flood Control Act of 1950 was sufficient authorization.

The lack of reference to a reregulating dam in the Corps' earliest budget requests for the Kootenai River caused confusion when it later appeared in appropriation measures:

"Senator Ellender. All right. Libby Reservoir, Kootenai River, Montana.

Under (physical data) this year we show a new item for a reregulating reservoir. At what point did it become apparent that such a reservoir would be necessary, and why wasn't the need for the reregulating reservoir foreseen at an earlier stage?"

U. S. Senate Subcommittee on Appropriations, March 11, 1968, p. 429.

General Yates of the Corps proceeded to explain that the need was indeed foreseen earlier, prior to authorization of the main dam. And because the Corps foresaw the need prior to authorization, they chose to interpret authorization of the main dam to be authorization for the reregulating dam as well. Unfortunately, General Yates' retrospective analysis conflicts with the information that Congress had in its possession at the time of authorization—that information being that reregulation was only a contingent and remote possibility. Moreover, General Yates' explanation conflicts with the sworn testimony of Larry Shannon, Project Manager for the Corps at Libby Dam, that the Corps didn't decide until 1966 that a reregulating dam was necessary. If the Senate Subcommittee on Appropriations was confused about the reregulating dam in 1968, Congress certainly couldn't have been speaking with any clarity on the subject in the Flood Control Act of 1950.

■ Defendants maintain, however, that because the congressional committees did not object to the Corps' belief that the Flood Control Act of 1950 authorized the reregulating dam, such was tantamount to approval. It is highly doubtful that Congress would look kindly upon a court equating lack of objection with positive authorization. It is axiomatic that congressional approval does not occur by acquiescence. The United States Supreme Court recently dispensed with a similar argument in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Tennessee Valley Authority argued that because a congressional appropriations committee did not object to Tennessee Valley Authority's belief that the Endangered Species Act of 1973 did not apply to construction of the Tellico Dam, such lack of objection amounted to congressional approval of Tennessee Valley Authority's position. The Supreme Court disagreed, stating:

"* * * Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress, . . . .

"Second, there is no indication that Congress as a whole was aware of TVA's position, although the appropriations committees apparently agreed with peti-

tioner's views. Only recently in *SEC v. Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), we declined to presume general congressional acquiescence in a 34-year-old practice of the SEC, despite the fact that the Senate committee *having jurisdiction over the Commission's activities* had long expressed approval of the practice. MR. JUSTICE REHNQUIST, speaking for the court, observed that we should be 'extremely hesitant to presume general congressional awareness of the [practice] based only upon a few isolated statements in the thousand of pages of legislative documents.'" *TVA v. Hill*, 437 U.S. at 192, 98 S.Ct. at 2300.

■ The Corps' own behavior in proceeding with LAURD begs a question or two. Initially, the Libby Dam project contemplated 6–10 generating units with the future possibility of construction of additional units. Ultimately, the "future possibility" was realized when the Corps decided to build 4 more units at the reregulating dam site. In this instance, however, the Corps did seek congressional approval for the 4 new units.[3] If the Corps felt approval was needed for the 4 new units, why didn't it feel approval was needed for the reregulating dam itself, which was just as much a contingency in 1950 as the 4 new units were? Also, if the need for a reregulating dam was truly foreseen prior to the 1950 authorization, as General Yates claimed, why did the Corps stand by and permit the Montana Highway Department to build Montana State Highway 37, knowing that 7 miles of it would have to be relocated when the reregulating dam was built? There are simply too many inconsistencies, too many unanswered questions for this court to find that the Flood Control Act of 1950 authorized construction of the reregulating dam. To allow the Corps to proceed with construction of the reregulating dam based only upon the sparse reference to it in H.D. 531 would raise the "specter of an unlawful delegation of legislative power." *Atchison, Topeka and Santa Fe Railway Co. v. Callaway*, 382 F.Supp. 610, 616 (D.D.C.1974).

■ Defendants second contention with reference to authorization is that Congress approved the reregulating dam by appropriating funds for it. However, precedent clearly determines that appropriation cannot be equated with authorization.

"* * * We recognize that both substantive enactments and appropriations measures are 'acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. Not only would this lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation, but it would flout the very rules the Congress carefully adopted to avoid this need." *TVA v. Hill*, 437 U.S. at 190–191, 98 S.Ct. at 2299–2300.

■ Finally, defendants urge this court to find authorization for the haul bridge portion of the dam in the General Bridge Act, 33 U.S.C. § 525 et seq. The evidence presented at the hearing clearly indicates that the haul bridge is an integral part of the entire LAURD project, and it seems quite improbable that Congress would authorize the haul bridge without the rest of the project. In addition, the frequent reference in the General Bridge Act to tolls and the Department of Highways indicate the Act was enacted relative to general purpose transportation bridges rather than to such limited purpose uses as a haul bridge.

■ On the basis of the evidence and exhibits presented at the hearing, this court finds that plaintiffs have made a sufficient

---

3. *See* Water Resources Development Act of 1974. P.L. 93–251, Title I, 88 Stat. 12.

showing that they are likely to succeed on the merits of their claim concerning congressional authority. When federal statutes such as 33 U.S.C. § 401 have been violated, it is not necessary for a court to inquire into the other requirements for equitable relief. *U. S. v. City and County of San Francisco,* 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050, *reh. den.,* 310, 657, 60 S.Ct. 1071, 84 L.Ed. 1420 (1940).[4] In the present case, however, the equities appear to lie with plaintiffs anyway. If the reregulating dam is not given congressional approval, harm to the environment in the form of degradation of recreational and aesthetic interests, and the expenditure of public funds will have been needless. Attention to the public interest requires that congressional authorization be given highest priority.

## II. Endangered Species Act

Plaintiffs second count alleges a violation of the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543, in that proper procedures have not been followed to ensure preservation of the northern bald eagle—an endangered species.[5]

 Defendants assert that the court does not have subject matter jurisdiction of this issue because plaintiffs failed to comply with the 60-day notice provision [6] of the Act prior to filing this lawsuit. The 60-day notice requirement, however, pertains only to the "citizen lawsuit" provision of the Act, 16 U.S.C. § 1540(g)(1). This citizen suit section is not an exclusive remedy under the Act.[7] Consequently, plaintiffs have the right to bring this action under 28 U.S.C. § 1331 without giving prior notice to the Secretary of the Interior. *See, Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 319, 510 F.2d 692, 699 (1975).

Under the terms of the Act, all federal agencies have a duty to consult with the Secretary of the Interior to ensure that actions carried out by them

"do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U.S.C. § 1536.

 The plaintiffs failed to prove to the satisfaction of this court that the Corps' activities on the Kootenai River jeopardized the existence or habitat of the bald eagle. Testimony indicated that certain portions of the Kootenai River near the Libby Dam were indeed habitat of the bald eagle. But there was nothing to indicate that construction of LAURD would destroy or modify that habitat. Future evaluation and completion of the Craighead study [8] may indicate that LAURD would put the bald eagle or its habitat in jeopardy. If that becomes the case, LAURD may have to be modified or abandoned altogether, for the mandate of the Endangered Species Act, and the priority that preservation of such species must receive, is clear. *TVA v. Hill,* supra.

4. *See also, TVA v. Hill,* 437 U.S. at pp. 193–195, 98 S.Ct. at pp. 2301–2302.
 "It is correct, of course, that a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law. * * * As a general matter it may be said that '[s]ince all or almost all equitable remedies are discretionary, the balancing of equities and hardships is appropriate in almost any case as a guide to the chancellor's discretion.' * * *
 But these principles take a court only so far. * * * Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto."

5. The bald eagle was classified as an endangered species in 43 Fed.Reg. 31 (Feb. 14, 1978).

6. 16 U.S.C. § 1540(g)(2).

7. 16 U.S.C. § 1540(g)(5):
 "The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief . . . ."

8. A study commissioned by the Corps of Engineers, pursuant to their responsibilities under the Endangered Species Act, to determine the long-term effect of the LAURD project upon the bald eagle and its habitat.

The fear expressed by plaintiff that allowing the Corps to continue with construction would amount to an "irreversible and irretrievable commitment of resources," and thereby make a sham of the consultation process required under the Act,[9] is now moot. Construction has been halted on other grounds, and this court's injunction shall remain in effect until a trial on the merits can be held. By that time, the Craighead study should be complete and the consultation process with the United States Fish and Wildlife Service should have resulted in a biological opinion which will determine the issues that are now speculative.

### III. Flood Control Act of 1936 and Water Resources Council "Principles and Standards"

Plaintiffs' third count alleges that a benefit-cost study of LAURD was improperly compiled pursuant to the Flood Control Act of 1936, 33 U.S.C. §§ 701a–701f, 701h. That Act provides that federal flood control projects may be constructed only if the benefits exceed the costs of the projects. 33 U.S.C. § 701a. This policy has been reinforced by the "Principles and Standards" of the Water Resources Council, 38 Fed.Reg. 24778 et seq. (Sept. 1973), under the authority of the Water Resources Planning Act, 42 U.S.C. § 1962a–2.

 Courts have consistently held that benefit-cost studies are not reviewable under the Flood Control Act of 1936. *Environmental Defense Fund v. Tennessee Valley Authority,* 371 F.Supp. 1004, 1014 (E.D. Tenn.) affirmed 492 F.2d 466 (6th Cir. 1974). However, in order to fully comply with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (NEPA) an Environmental Impact Statement (EIS) must include a benefit-cost study taking into account environmental considerations. Under NEPA, such benefit-cost studies are judicially reviewable. *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 356

(8th Cir. 1972); and *State of Alabama ex rel. Baxley v. Corps of Engineers,* 411 F.Supp. 1261 (N.D.Ala.1976). Therefore, this aspect of plaintiffs' third count does not establish a reviewable claim. In the fourth count plaintiffs allege violations of NEPA and incorporate the allegations as to benefit-cost studies thereunder.

Plaintiffs also assert in count three that the benefit-cost study does not comply with the "Principles and Standards" adopted by the Water Resources Council. These "Principles and Standards" were promulgated pursuant to 42 U.S.C. § 1962a–2. While they were published in the Federal Register,[10] the "Principles and Standards" have never been published in the Code of Federal Regulations. As such, it is doubtful they have the force and effect of law. Because of this uncertainty, there is very little likelihood that plaintiffs will prevail on this count.

### IV. National Environmental Policy Act (NEPA)

In the fourth count plaintiffs allege that defendants failed to comply with the requirements of NEPA in that the Environmental Impact Statement (EIS) and supplements prepared by defendants are inadequate in their discussion of alternatives to LAURD, benefit-cost ratios and recent developments concerning environmental impacts of the project. Failure to comply with the requirements of NEPA is reviewable in federal court.[11]

#### A. Alternatives

 NEPA requires federal agencies to develop and thoroughly consider alternatives to proposed actions. 42 U.S.C. § 4332(2)(C)(iii) and (E). The Council on Environmental Quality (CEQ) regulations define this responsibility with even greater detail, establishing that all reasonable alternatives must receive a "rigorous explora-

---

9. *See,* Interagency Cooperation Regulations, 50 C.F.R. §§ 402.01–402.05, 43 Fed.Reg. 874 et seq. (Jan. 1978).

10. 38 Fed.Reg. 24778 et seq. (Sept. 1973).

11. *See,* e. g. *Cady v. Morton,* 527 F.2d 786 (9th Cir. 1975).

tion and objective evaluation." 40 C.F.R. 1500.8(a)(4). The performance of this duty requires substantive, good-faith consideration of alternatives "to the fullest extent possible," a very high standard. *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 38, 449 F.2d 1109, 1114 (1971). Furthermore, the discussion of alternatives in the EIS is not to be limited to those alternatives available to the particular agency preparing the EIS, but must consider options available to the government as a whole. 40 C.F.R. 1500.8(a)(4); *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 12, 458 F.2d 827, 834 (1972).

The relevant documents in this case consist of the Final EIS on the main Libby Dam (Joint Exhibit 1), EIS–Supplement I pertaining to LAURD (Joint Ex. 2), Information Supplement II entitled "Construction of Temporary Haul Bridge" (Joint Ex. 3) and Information Supplement III on the bald eagle (Defendants' Ex. 4). Only EIS–Supplement I is directly applicable to the question of alternatives.

 It is this court's conclusion that the Corps violated Section 102 of NEPA [12] by failing to adequately consider the alternative of meeting the Northwest's energy needs through other sources, the alternative of conservation, and the no-action alternative.

In EIS–Supplement I, prepared in September, 1974, the Corps states that LAURD "should reduce the need for the development of other sources of power in the Northwest such as oil or coal and increase the energy self-sufficiency of the nation." [13] There is, however, no analysis, not even mention, of the various energy projects planned or under construction in the Northwest. There is nothing to indicate the Corps evaluated the need for LAURD in light of other energy development projects.

In Section 6.0 the Corps discusses "Alternatives to the proposed Action." Indeed, there is an 8-page discussion ranging from "Alternatives to Accomplish All Project Objectives", "Alternatives to Partially Accomplish Project Objectives", "No Action Alternative" to "Alternatives which would Require Implementation By Another Agency or Legislative Action." The discussion of coal-fired generating plants is especially indicative of the Corps' error in this area. After describing the availability of coal in Montana and Wyoming, the Corps proceeds with a litany of all the reasons why such plants are infeasible alternatives—transmission lines would have to be built, particulate emission, land condemnation. The Corps does mention, very briefly, that "coal-fired plants in Eastern Montana and in Wyoming are being considered or are under construction to supply some of the needs of the private power companies in the Pacific Northwest." But where is the analysis of how many coal plants are planned or actually under construction, and how much power they will provide—i. e., analysis of the necessity for LAURD? This analysis need not be exhaustive; "What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *NRDC v. Morton,* supra, 148 U.S.App.D.C. at 14, 458 F.2d at 836. The Corps may very well be correct in concluding that hydro power is more environmentally sound than coal-fired power; but if the coal-fired alternatives are already actualities,[14] isn't it the Corps' responsibility to assess the need for LAURD? [15]

The same incomplete reasoning pervades the discussion of other alternatives in Section 6.1 (pp. 6–1 through 6–6). In dismissing the other alternatives for one reason or

---

12. 42 U.S.C. § 4332.

13. EIS–Supplement I, Section 4.15 "National Economic Effects", p. 4–12.

14. Construction on Colstrip I and II began in 1971. Colstrip I became operational in November of 1975 and Colstrip II became operational in August 1976. Construction on Colstrip III and IV has begun, but is currently halted pending final disposition of legal proceedings.

15. This will also be Congress' responsibility now, since authorization must be obtained.

another, the Corps fails to explore whether or not any of those alternatives are actually being pursued, either by the government or private enterprise. Nowhere in the EIS is there evidence that the Corps considered the contributions to the energy problem to be made by Colstrip, the Northern Tier and Alaskan Pipelines or other energy producers.[16]

■■■■ It is disturbing to look at the environmental impact to this state alone that will result if all the current energy proposals—Colstrip 3 and 4, Northern Tier Pipeline, oil and gas development in the Flathead, future Army Corps of Engineers dams and more—come to fruition. All of these projects seek to hang their hat upon the future energy needs of this nation. This is the essence of the requirement to consider all alternatives, not just those within the particular agency's jurisdiction. Nor is it enough for the Corps to rule out the other alternatives because theirs is "better." The Corps must evaluate, as reasonably as possible,[17] the potential and probability of actualization of those alternatives. This burden will not be borne by the Corps alone, but by the other project-developers as well. The court sympathizes with the fact that some of the necessary information was not available to the Corps at the time EIS–Supplement I was compiled. Nonetheless, an agency is under an obligation to reassess a project as more information becomes available. By enacting

NEPA, Congress mandated that all agencies, and all competing energy industries that seek permits from agencies, must take a comprehensive and responsible approach to development of our nation's resources, rather than piecemeal, myopic approaches.

■■ The discussion of the "no-action" alternative, 6.3, also contravenes the letter and spirit of NEPA. The peak-power deficit forecasts relied upon by the Corps reflect the years 1974–75, yet LAURD was not projected for completion until 1982–83.[18] The current forecasts for the early 1980's, as projected by Bonneville Power Administration (BPA) and the Pacific Northwest Utilities Coordinating Council show a surplus of peaking power and a shortage of base-load power, even without LAURD.[19] Again the court is cognizant that the Corps did not have this information in 1974. The point is that agencies have a responsibility to re-evaluate the need for their projects as more information becomes available. This is especially true when construction on those projects is in the infant stages, such being the case with LAURD.[20] The requirements of NEPA impose a continuing obligation upon agencies to re-evaluate the necessity for projects in light of changed circumstances.

The reference to the alternative of conservation[21] is much too conclusory. The Corps discusses the importance of conservation, but dismisses it as a viable alternative to LAURD, saying "there is not at present

16. In Section 6.1.2 the Corps discusses the alternative of substitute hydro facilities, with the remark:

"Those sites where development is both feasible and acceptable are already in the planning stage and are essential to meeting forecast power needs."

This assertion raises two inquiries: Is the Corps assuming the entire burden of meeting the Northwest's future energy needs? If those projects in the planning state are already deemed "essential" by the Corps, how seriously will the Corps perform the duty to consider alternatives, particularly the "no-action" alternative?

17. "(T)he requirement in NEPA of discussion as to reasonable alternatives does not require 'crystal ball' inquiry. Mere administrative difficulty does not interpose such flexibility into

the requirements of NEPA as to undercut the duty of compliance 'to the fullest extent possible.' But if this requirement is not rubber, neither is it iron." NRDC v. Morton, supra, 148 U.S.App.D.C. at 15, 458 F.2d at 837 (footnote omitted).

18. EIS–Supplement I, Section 1.1 "Project Description", p. 1–1.

19. Plaintiffs' Exhibit 12.

20. In this case, it is essential that current information concerning alternative and power need forecasts be supplied to Congress if authorization is requested.

21. EIS–Supplement I, Section 6.4.2 "Induced Reduction in Load Growth", p. 6–8.

sufficient evidence to warrant delaying the on-line dates of Libby Additional Units." Recent studies by the BPA and the General Accounting Office [22] indicate there is evidence to conclude that conservation in the Pacific Northwest will have a considerable impact. This information should be explored and analyzed in greater depth by the Corps in preparing a new EIS.

### B. Benefit-Cost Ratios

Plaintiffs claim that the EIS fails to include an adequate benefit-cost analysis as mandated by NEPA.[23] EIS–Supplement I does include estimated costs and benefits in Table 1, extracted from the Corps' General Design Memorandum Phase I. The costs do not seem to account for recreation losses in the form of quantifying fisherman and hunter days lost, nor river recreation losses such as rafting. The Corps was criticized for this omission, by the Montana Department of National Resources and Conservation, the Environmental Protection Agency, and the U. S. Department of Interior.[24] The Corps admits in response that "Recreation losses and separately appropriated fish and wildlife costs were not included in this analysis." [25]

Under NEPA, a court is empowered to review the benefit-cost analysis in the EIS. *Sierra Club v. Callaway,* 499 F.2d 982, 991–992 (5th Cir. 1974). In addition, NEPA requires that all environmental amenities be quantified to the fullest extent reasonably possible.[26] That is, where environmental or non-environmental factors are reasonably susceptible of being quantified in dollars such must be done. Where such factors are not reasonably susceptible of being quantified in economic terms, but can be quantified in terms other than economic, such must done; where a particular factor cannot be quantified in any terms, all that NEPA requires is full disclosure of that factor in a manner sufficient to permit the decision-maker to weigh that factor.[27] The testimony of Dr. Duffield indicates that recreation costs are susceptible of economic quantification under the relatively new science of "environmental economics." As such, they must be included in the EIS.

### C. Recent Developments

Finally, plaintiffs assert the EIS lacks discussion of significant developments that have occurred subsequent to preparation of the EIS. In particular, plaintiffs refer to the listing of the northern bald eagle as an endangered species and the listing of five archeological sites in the LAURD project area as being eligible for inclusion on the National Register of Historic Places. In view of the court's earlier determination that the EIS must be revised and updated, suffice it to say that the new EIS shall have to consider the impact of LAURD upon the bald eagle and the archeological sites.

On the basis of the evidence and exhibits with regard to plaintiffs' fourth count, the court finds that plaintiffs have demonstrated a sufficient likelihood of success on the merits. As with Count I, the equities again lie with plaintiffs. The paramount importance to be given to NEPA and protection of the environment aligns itself heavily on the side of the public interest.

### V. National Historic Preservation Act

Plaintiffs' last count alleges that the Corps has not complied with the provisions of the National Historic Preservation Act, 16 U.S.C. §§ 470–470t, the regulations issued pursuant thereto (36 C.F.R. § 800) and Executive Order No. 11593, 36 Fed.Reg. 8921, May 13, 1971. Plaintiffs' primary evidence with regard to this allegation came through the testimony of Mr. Wayne Cho-

---

**22.** See plaintiffs' Exhibit 8.

**23.** 42 U.S.C. § 4332.

**24.** EIS–Supplement I, Section 9.0 "Coordination and Comment and Response", pages 9–5 and 9–9.

**25.** Id, at p. 9–6.

**26.** *State of Alabama ex rel. Baxley v. Corps of Engineers,* supra at 1268.

**27.** Id.

quette, an archeological coordinator with the University of Idaho. Through Mr. Choquette, plaintiffs established that there are several "significant" archeological sites within the LAURD project area relating to historic and prehistoric settlements. One such site has already been covered over by construction of the haul bridge. However, the University of Idaho archeological crew was able to salvage some of the more important artifacts prior to the bridge's construction. Plaintiffs' chief complaint seems to be that the Corps' construction schedule would prevent the crew from completing an adequate archeological "dig" and salvage of the sites.

The testimony, though compelling, was not extensive enough to establish plaintiffs' likelihood of success on this issue. However, the order for an injunction on other grounds should serve to provide the archeological crew with additional time in which to complete their activities. Moreover, the directive requiring the Corps to prepare a new, revised EIS will necessitate a closer look at the archeological issue.

## SUMMARY

Because plaintiffs have demonstrated a likelihood of success on the merits with regard to the congressional authority and NEPA issues, and after balancing the equities, the court finds that a preliminary injunction is an appropriate remedy. As to Count I, defendants will have to secure separate Congressional authority for the LAURD project. As to Count IV defendants will have to prepare a new, revised EIS that demonstrates a good faith, consideration of alternatives, that includes a more detailed benefit-cost analysis, and contemplates recent developments. In the interests of justice and of protecting plaintiffs' right to judicial review, the court will not require the posting of a security bond.