Olivia P. BURKEY, as Administratrix of the Estate of Earle Montgomery and Individually, Plaintiff,

v.

John R. ELLIS, C. B. Munroe, W. B. Lingle, and C. W. Friday, Defendants.

Civ. A. No. 71–G–644–E.

United States District Court, N. D. Alabama, E. D.

Sept. 6, 1979.

Robert R. Reid, Jr. and Allen Poppleton, Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

J. R. Brooks, U. S. Atty., Henry I. Frohsin, Elizabeth Todd Campbell, Asst. U. S. Attys., Birmingham, Ala., for W. B. Lingle & C. W. Friday.

George F. Wooten and Clark Carpenter, Dixon, Wooten, Boyett, McCrary & Thornton, Talladega, Ala., for John R. Ellis and C. B. Munroe.

## OPINION

GUIN, District Judge.

This action was brought to enjoin the defendants, both state and federal, from constructing, installing or further authorizing or financing any stream modification or channelization of Blue-Eye Creek, a tributary of the Coosa River in Talladega County, Alabama. That project was proposed by the Soil Conservation Service of the U. S. Department of Agriculture ("SCS") and the Blue-Eye Creek Watershed Conservancy District ("the District"). Defendants in 1968 and 1969 had installed two small dams or flood water retention structures in the upstream reaches of Blue-Eye Creek and since then have implemented a plan for conservation land treatment of lands in the watershed designed to control rainfall runoff and promote land stabilization. At the time of the earlier hearing of this case in 1973, defendants were, in addition, proceeding with plans to channelize eight miles of the creek, including that portion running through lands owned by Mr. Earle Montgomery, now deceased, for whose estate the present plaintiff is administratrix. By its Order of September 11, 1973, this Court enjoined that channelization project, 364 F.Supp. 517. In that decision, it was found that the proposal to proceed with channelization constituted an arbitrary decision in violation of provisions of the National Environmental Policy Act of 1969 (42 U.S.C.A. § 4321 et seq.) ("NEPA"), particularly in employing the artificially low interest rate of 3¼% and long 100-year project life in formulating the plan for the project and in combining, for evaluation purposes, the channel work with the then already constructed small dams.[1]

Since 1973, defendants have reworked the project and filed a revised environmental impact statement ("the REIS"). The new project is designed to protect rural areas only against a 0.75-year storm (i. e. a storm of a frequency that will occur more often than once a year), which is estimated in the REIS to be protection against 40–50% of projected flooding, and will cost approximately $72,000/mile. In addition, defendants have, in the revised project, omitted channelization of an intermediate stretch of the creek passing through plaintiff's and some other lands. Thus, this fragmentation of the channelization will place those lands not only immediately below a channelized portion but also upstream from another channelized portion, a situation plaintiff claims will subject the intervening segment to resultant downstream flooding and bank erosion from the upstream channelization and also resultant bank erosion caused by increased velocity of stream flow from the downstream channelization.

Much emphasis has been placed in the REIS on the need to decrease projected flooding in the Town of Lincoln, which is situated at the downstream end of the project. However, SCS in its own reports (such as the excerpt from its 1971 Annual Report previously submitted in this cause) has stated that, even in times of heavy rainfall, flooding is reduced and the water retention structures are all functioning properly. The affidavit of Mr. Montgomery heretofore filed states it has been noted that flooding upstream from Lincoln has

---

1. Appeal was taken from that decision but was later dismissed on motion of the defendants (1–31–74).

been substantially reduced since completion of the water retention structures in 1968 and 1969. That effect has been further confirmed by affidavit submitted this year that, in the heavy rainfall of March 30–31, 1977, and in the recent heavy (but not as heavy) rainfall at the beginning of March, 1979, the channel of Blue-Eye Creek in Lincoln was substantially containing the flood waters of the creek and there was no flooding of the principal business streets in Lincoln, notwithstanding that there were substantial increases in the water level of Lake Logan Martin on the Coosa River into which Blue-Eye Creek flows.

■ On the basis of the REIS, both the federal and state defendants have filed motions to dissolve the previous injunction. The Court has heard argument on those motions and received several briefs and numerous affidavits in behalf of all parties. It is the Court's opinion that the decision of the defendants to proceed with the revised project is reviewable as being arbitrary and an abuse of administrative discretion under the Administrative Procedure Act (5 U.S. C.A. § 701 et seq.) and in violation of the substantive, procedural and disclosure requirements of NEPA, in particular because of the necessity of relying on one or more of the following factors in order to achieve a favorable benefit-cost ratio: Combination of the dams and channelization (with low historic costs allocated to the former, but computation of benefits at current prices), use of the unduly long 100-year project life, and use of the arbitrarily low 3¼% interest rate, as well as the other deficiencies set forth below. Consequently, defendants' motions to dissolve the injunction are due to be overruled.

The Court's ruling was announced in open court on July 30, 1979; the alternative reasons supporting it are set forth in greater detail in the following parts of this opinion:

I. *Invalid Benefit-Cost Ratio*

■ It is necessary for a stream channelization project to have a favorable benefit-cost ("B/C") ratio in order to fall under the authorizing statute, 16 U.S.C.A. § 1005. In addition, NEPA requires a balancing of

claimed economic benefits from a project against costs—see, for example, the leading case of *Calvert Cliffs Coordinating Comm. v. AEC*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (D.C.Cir. 1971), especially the portion at 146 U.S.App.D.C. 47 at 449 F.2d 1123 quoted in this Court's earlier opinion at 364 F.Supp. 524, and also the decision of this District Court in *State ex rel. Baxley v. Corps of Engineers (Luxapalila Creek)*, 411 F.Supp. 1261 at 1268 (N.D.Ala.1976).

■ NEPA is more than an environmental full disclosure law; it also requires the substantive review of agency determinations. This Court has so held in its previous opinion, citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). That holding was approved by the Fifth Circuit in *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123 (1974), and *Sierra Club v. Callaway*, 499 F.2d 982 (1974). To the same effect are *Environmental Defense Fund v. Froehlke (Cache River)*, 473 F.2d 346 (8th Cir. 1972), and *Conservation Council of North Carolina v. Froehlke (New Hope Dam)*, 473 F.2d 664 (4th Cir. 1973). Consequently, if defendants' decision to proceed is based upon arbitrarily constructed elements of the B/C ratio, or if it is otherwise capricious, an abuse of discretion, or fails, under NEPA, to give sufficient weight to environmental factors, that decision is subject to review and reversal by the courts. Further, as to the reviewability of agency decisions, see particularly the discussion and decisions cited in Part III of this Court's prior opinion at 364 F.Supp. 529–33. In addition, the Fifth Circuit has stated that "the majority and better reasoned rule favors such review (of substantive agency decisions under NEPA)", 492 F.2d at 1139, and indicated, at fn. 18, its agreement with the extent of review under NEPA set forth in said Part III. Analysis of the three principal B/C factors referred to above and displayed by SCS in the REIS follows:

(A) *Invalid Combination of Dams and Channelization*

■ One of the most serious factors upsetting the B/C ratio under NEPA in the

present case is the combination of the dams constructed in the 1960's and the proposed channel work that would be constructed today. Throughout the REIS, the SCS charges that ratio with only the actual historic costs of the dams, which, due to inflation, would be much higher today. Yet, it computes benefits on the basis of 1974–75 prices.[2] Thus, there has been built into the B/C ratio an inflationary swing by using 1968–69 construction costs for the dams but 1974–75 prices for the benefits allocable to them. It is, consequently, impossible under such a presentation to reach a legitimate balancing of benefits and costs as required by NEPA. See, for example, *Calvert Cliffs* at 146 U.S.App.D.C. 47 at 449 F.2d 1123 and *Cache River* at 473 F.2d 356.

This Court, in its prior opinion and order, treated the proposed channelization separately from the dams, and ample reasons for doing so are set forth in that opinion. Since those reasons have not changed, evaluation of the channel work separately from the dams is proper and is the law of the case applicable to the present proceeding. However, to reiterate briefly: SCS itself contemplated that the dams and channel work would be separate because the easements necessary for the channel work were acquired after the dams had actually been completed.[3] Thus, when construction of the dams was undertaken, SCS and the District then had no assurances that it would be possible to install the channel work. In addition, as shown by the SCS's own reports and the affidavits submitted in this cause and referred to at the beginning of this opinion, even in times of heavy rainfall, downstream flooding has been reduced, the dams are functioning properly, and there was then no flooding of the principal business streets in Lincoln.[4]

(B) *Invalid Use of Unduly Long Project Life*

■ In this Court's original opinion and order, it directed the defendants to use a project life not exceeding 50 years. While the SCS displays, in an appendix to the REIS, B/C ratios for both 50-year and 100-year project lives, SCS strenuously urges in the plan formulation for the current project a 100-year life, contending that the project is designed to provide a steady stream of benefits throughout its life. The issue of a 100-year versus a 50-year life was an issue litigated in the previous proceedings in this case; consequently, the requirement to use a 50-year life is the law of this case and binding in these proceedings.[5] Alternative to the holding that it is the law of the case, factors supporting that decision, especially those gleaned from prior experience of both the SCS and Corps of Engineers themselves with stream channel projects, are as follows:

(1) The standard project life used by the Corps for projects much larger than this

2. See, for example, Appendix A, stating in footnotes 1 and 6: "Crop and pasture benefits current normalized prices (October *1974*); other benefits *1975* prices. . . . *Actual costs* for structures 1 and 2 and channel work already installed (that is the 1.8 miles upstream from one of the water retention structures) amortized for 100 years at 3⅛% and 1975 costs for proposed channel work amortized for 100 years at 3¼%." (Emphasis supplied.)

3. See the schedule of easements attached to the affidavit in behalf of SCS dated July 17, 1972, and filed during the previous proceeding.

4. SCS has cited *Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29 (3d Cir. 1976), in support of its contention that it could combine dams and channel work as one project evaluation under NEPA. That case supports judicial review of an agency decision to proceed with a project but, however, is completely distinguishable as to the combination issue here under consideration. *Buck Hill Falls* involved the construction of three dams, but they were all being built at approximately the same period of time. Thus, none of the factors referred to above that separate already completed from proposed new work were involved. Secondly, that decision was limited by its own terms to the question of a B/C determination under 16 U.S.C. 1005, the authorizing statute, the court stating that the SCS appeals only from "this conclusion that there has been a violation of 16 U.S.C. 1005." Thus, NEPA was not placed in issue; and, in fact, the case was remanded for further proceedings, which included whether or not there was compliance with NEPA.

5. See also Footnote 1, *supra*.

one is 50 years. The testimony of Dr. Paul E. Roberts, Jr., an economist with considerable experience in appraising such projects as this, whose affidavit has been previously filed in this case, shows by his statements as reported in the *Gillham Dam* case, *Environmental Defense Fund v. Corps of Engineers*, 325 F.Supp. 728 at 761 (E.D.Ark. 1970), that the present standard for a Corps water resource project life is 50 years. Confirming that appraisal is the fact that the very large Tennessee-Tombigbee Waterway, which obviously will receive great attention in the field of continuing maintenance since it is designed to handle much barge traffic, has been evaluated by use of a 50-year life.[6]

(2) As background data for the computations included in the REIS, SCS includes redevelopment benefits, which are claimed to contribute a significant amount to benefits from the project. Such benefits are explained as:

> "Redevelopment benefits result from project installation. They are calculated as a percent of construction costs. These benefits have accrued to the region as a result of wages paid to labor *during installation of the project.* . . . These benefits should accrue locally. Therefore, 30% of construction costs amortized at the appropriate interest rate was used." (Emphasis supplied.)

Thus, construction costs are automatically reduced, in computing the B/C ratio, by 30% based on alleged redevelopment benefits that can be performed only during the time of project installation. However, it should be clear that those benefits could not continue to accrue for a 100-year period, or even a much shorter period, since they are paid at the time of installation which would not take over one year—and certainly not over two years. It, therefore, appears on the face of the REIS that the benefits cannot actually accrue in a steady stream over the entire claimed 100-year project life.

(3) Dr. George W. Folkerts, an expert biologist who has examined a great number of SCS stream channelization projects and who was an expert witness in *Natural Resources Defense Council v. Grant (Chicod Creek)*, 355 F.Supp. 280 (E.D.N.C.1973), submitted an extensive affidavit on the stream channelization project involved in that case in which the court found SCS's EIS to be insufficient. A copy of the portions of Dr. Folkert's affidavit submitted in that case dealing with erosion and sedimentation and downstream flooding has been submitted in this cause. It shows that there are numerous examples where SCS projects have had very short lives, including one in Kentucky where the banks of the stream eroded sufficiently that a farmer's fence had to be moved back four times within the space of seven years, and Crow Creek in Alabama where there has also been loss of pasture land. The court in *Chicod Creek* referred to that evidence, in treating SCS's claim that there would be no significant reduction in downstream water quality from the increase in sedimentation, and concluded that "[c]redible evidence suggests the opposite conclusion." 355 F.Supp. at 287.

(4) In *Luxapalila*, it was pointed out in the EIS prepared by the Corps of Engineers, when describing previous channel modifications of that stream (at Sec. 2.76): "The lower end of the canal (channel) ultimately became clogged with sand and debris so that the bottomland adjacent to the filled section was often filled with pools of stagnant water creating a more undesirable condition than existed before the project was undertaken." Then only 20 years later, the creek had to be rechannelized; but "additional filling has occurred since that time and the lower end of the excavated canal is reverting to the old conditions." In addition, the Corps claimed that the presently proposed channelization would produce only "a small temporary increase in turbidity", a claim similar to that made in the present case; but the Court in this District noted that testimony "characterized the expected increase in turbidity as substantial, perma-

---

**6.** See in this connection the project life set forth in the lower court report of the first case involving that project at 348 F.Supp. 916, 934 (N.D.Miss.1972).

nent and certain." 411 F.Supp. at 1265, fn. 3.

 Further, in answer to plaintiff's Interrogatory (6), SCS has stated that it has no specific experience that stream banks will stabilize in the claimed three-year period. It is also noted that an affidavit filed by SCS in the present proceedings shows a number of stream channelization projects in Alabama with 50-year evaluations, thus refuting the contention that SCS is somehow compelled to use a 100-year life in this particular case. It is incumbent upon the agency involved to explicate fully its course of inquiry, its analysis and its reasoning. *Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973); *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971). In view of the fact that the Corps of Engineers uses a 50-year life for much larger projects (and ones that doubtless will receive more continuing maintenance) and in view of the fact that experience with SCS and Corps projects have shown shorter lives than 50 years, it is required as a matter of law that SCS use a project life not exceeding 50 years. A longer life for the channelization would not be within the permissible zone of administrative discretion. Certainly this would be true in view of the experience with numerous projects showing lives not exceeding 50 years. If SCS wishes to use any project life exceeding the actual experience of its own projects, it must, in order to give the adequate disclosure required by NEPA, state the experience showing the shorter project lives and fully explain why such a shorter life will not occur in the case of the project being evaluated. Failure to do so makes an environmental impact statement clearly misleading.[7]

**(C) *Invalid Use of Low Historic Interest Rate***

 As in the previous litigation in this cause, SCS strenuously urges use of the historically low interest rate of 3¼% in computing benefits and costs of the proposed channelization. Use of such a rate was enjoined by this Court's previous order; and, as shown by the REIS, the current interest rate (in 1977) would be 6⅜%. However, since this Court's previous decision in 1973, the Water Resources Development Act of 1974, P.L. 93–251, was enacted. It contained in Section 80 (42 U.S.C.A. § 1962d–17) pertaining to interest rates, a formula specifying current rates but with a so-called "grandfather clause" in Subsection (b) that historic and low interest rates might be used "*if* the appropriate non-Federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non-Federal share of project costs." The Court is, however, of the opinion that SCS is not entitled to use the Section 80(b) "grandfather clause" in this case for the following separate reasons:

(1) Turning first to the meaning of "satisfactory assurances", it has been held by this District Court in *Luxapalila* that:

> "The phrase 'satisfactory assurances' as used in Sec. 80(b) is used in a general, nonspecific sense and vests no particular public official with the authority to make a determination of precisely what degree of assurances is required in order to be considered 'satisfactory'. Thus the phrase is to be tested by an objective standard rather than a subjective standard of a particular official." 411 F.Supp. at 1272 (headnote 13).

Were that not so, the applicability of Section 80, which then covered all agencies involved in water development projects,

---

7. SCS in answers to plaintiff's interrogatory to describe what factors support a 100-year evaluation, responded that they "include the objectives of the watershed project sponsors, the useful economic life and the design of the structural measures," referring specifically to the sediment storage capacity of the floodwater retarding structures. Obviously, the objective of the sponsors—or, in fact, SCS—cannot lengthen a project life beyond that to which it would physically extend. Further, whether or not the small dams are designed to contain sediment that might accumulate over 100 years is irrelevant here; it is the life of the channel work that is in issue and the evidence presented is clearly contrary to a 100-year life. The only genuine issue of fact is whether, in view of that data, small channel modification projects can have lives of 50 years (the Corps' maximum) or whether they must be less.

would be determined by the particular regulations of each different agency or even by the individual determinations of many different government officers and could differ from one agency or one officer to another.

In *Luxapalila*, since the local state agency involved had not received any appropriations and had not issued any bonds to raise funds, it was held that, applying an objective standard, the kind of satisfactory assurances contemplated by Sec. 80(b) could not have been given prior to the cut-off date and that the interest rate must be a current one computed under Sec. 80(a). In answer to interrogatories in this case, the District, at the time of its initial work plan for the project, had no assets and no liabilities. Later, it acquired certain easements (but not all necessary for the project then proposed) and had incurred liabilities of approximately $1,650.

The SCS contends in the REIS:

"The sponsors of the project provided satisfactory assurances of payment of their share of the project costs by the execution of the watershed work plan agreement in 1965."

However, it is obvious that they could not have done so since at that time the District was merely a corporation on paper with no assets or liabilities and could not have provided any satisfactory assurances from an objective point of view.

■ The defendants contend, however, that since they have now eliminated channelization of the intervening segment of the creek (Reach IV on the SCS maps) as to which they do not have all necessary easements, they had all the necessary property rights needed for this project as of the cut-off date in 1969. Elimination of that intervening reach was, however, not made until 1975. Consequently, regardless of whether or not the present project would flood property in Reach IV and, hence, require flooding easements, the project as proposed at the time of the cut-off date *in 1969* required construction easements that the District did not then have and, admittedly, in the view of both the District and SCS, it then needed to have. Only in 1975

after this Court's prior order was the project changed; and that was, of course, several years after the 1969 cut-off date. Changing the project several years after 1969 can hardly amount to giving of the required "satisfactory assurances" back in 1969. That effort to create "satisfactory assurances" in 1969 by retroactively changing the project in 1975 is a patent attempt to adjust the facts to the law and unworthy of the U.S. Government. Such an attempt is due to be held inefficacious as a matter of law.

■ (2) While the Water Resources Development Act of 1974 was enacted subsequent to this Court's prior injunctive order, subsequent to it there was enacted on May 13, 1977, another statute, P.L. 95–28, providing in Sec. 204:

"It is hereby reiterated that the interest rates or rates of discount to be used to assess the return on the Federal Government's investment in projects of the United States Army Corps of Engineers or the Department of the Interior Bureau of Reclamation shall be those interest rates or rates of discount established by Public Law 93–251, the Water Resources Development Act of 1974. . . . "

It is noted that that re-enactment of the discount rate section, i. e. Sec. 80 discussed above, applies only to Corps of Engineers and Bureau of Reclamation projects; the SCS was omitted. Therefore, by application of the established canon of statutory construction, *expressio unius exclusio alterius* (the expression of one means exclusion of others), SCS is no longer included under Sec. 80. *Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958) (headnote 1); 2A *Sutherland Statutory Construction*, Sec. 47.23, and numerous cases therein cited. If the legislative branch had wished to include all governmental agencies under Sec. 80, it could have easily done so; but it did not. Thus, there would appear to have been no purpose in enacting the 1977 provision if it were not to exclude other governmental agencies (such

as SCS, TVA and any others) from the applicability of Sec. 80.

While the Court recognizes that repeal by implication is not favored, Sec. 80 itself was, insofar as NEPA is concerned, also a repealer by implication. This is because it purported to mandate, in its "grandfather clause", a use of arbitrary historic interest rates which obviously would upset the balancing of the benefits and costs of a project that is supposed to take place pursuant to NEPA. Consequently, in determining benefits and costs for purposes of NEPA, a current rate should have been used in any event; but certainly, after enactment of the 1977 statute above referred to, current rates should be required for all SCS projects.

Each of the two foregoing alternative reasons separately requires use of a current interest rate of at least 6⅜% for plan evaluation under NEPA in this case; and the REIS shows on its face that an evaluation of the channel work alone at a 6⅜% rate (whether the project life is 50 or 100 years) is unfavorable.[8]

## II. *Factors Omitted from Benefit/Cost Ratio*

Defendants, at the end of their supplemental memorandum, contend that the REIS shows a favorable B/C ratio under various alternative evaluations of the project. Nevertheless, a reference to the display of those ratios in the appendices to the REIS shows that the ratio is unfavorable, i. e. less than unity, under the Court's holdings on the three principal factors set

forth in Part I of this opinion. Defendants claim further though that, even assuming channel work allegedly evaluated alone and a 50-year project life (but with the historic low 3¼% interest rate), the project will have a B/C ratio rounded off to 1:0 and, thus, would be marginally favorable. However, even under that presentation, the difference between benefits and costs is so negligible that inclusion of practically any additional costs would make the ratio unfavorable.[9]

This District Court has held in *Luxapalila*:

" . . . that NEPA requires a cost/benefit analysis in an EIS; that environmental as well as non-environmental facts must be included in that analysis on each side of the ledger; that where these factors (environmental and non-environmental) are reasonably susceptible of being quantified in economic terms (dollars), such must be done; . . . " 411 F.Supp. at 1268 (headnote 10).

Plaintiffs point out that there are at least certain factors susceptible of quantification that have been omitted from the B/C analysis of the Blue-Eye Creek Project. Among them is loss of fishing resources. Regardless of how much loss will occur, the opinion in *Luxapalila* shows that there are readily acceptable dollar values available for loss of man-days of fishing. See 411 F.Supp. at 1269–71. For that purpose, there must be considered not only the loss of whatever fishing resources there are in Blue-Eye Creek itself but also damage to that area as

8. Plaintiff urges, as another ground for the inability of the District to give "satisfactory assurances", that the District had not been incorporated properly under state law. The Court has received documentation and argument on that particular issue and feels that the District probably is now a de facto corporation.. However, since one of the factors to be relied on in establishing that status is the exercise of corporate functions over a certain period of time and there is dispute as to whether that length of time would have expired prior to or after the cut-off date in 1969—see, for example, *State ex rel. Martin v. City of Gadsden*, 216 Ala. 243, 113 So. 6 (1927), *State ex rel. Roberson v.*

*Town of Pell City*, 157 Ala. 380, 47 So. 246 (1908)—the Court is not ruling on that particular issue.

9. As shown by Appendix A–5 to the REIS, the difference between annual benefits and costs is only $165. Then, under Appendices A–6 and A–7, if a current interest rate of at least 6⅜% were required, the project would have a negative B/C ratio of 0.8:1.0 (assuming a 100-year evaluation period) or 0.7:1.0' (using a 50-year life). Only when the low 3¼% interest rate *and* a 100-year life are both used (Appendix A–4) do the benefits exceed costs by any reasonable amount.

a tributary stream and spawning area for fish inhabiting Lake Logan Martin.[10]

Further, no costs have been assigned to the downstream flooding of properties below the project itself over the 1 to 1.5 miles referred to in the REIS between the end of the project and Lake Logan Martin on the Coosa River.[11] Since SCS is able to compute claimed flood damage reduction benefits for the project, together with the several multipliers it has used in its B/C analysis, it naturally can likewise assign dollar values to an increase in flood waters on those downstream properties—at least those immediately below the end of the project.

▆ In addition, there will be destruction of certain woodlands. Certainly, some value can be placed on loss of trees although there would be a zone of administrative discretion within which SCS might act in that instance. Nevertheless, no costs for any of these factors have been included in the B/C ratio set forth in the REIS. Inclusion of virtually any costs for them would, under most of the presentations, make this proposed project more marginal and result in an unfavorable B/C ratio. The Court is of the opinion that there is not only a lack of full disclosure but also lack of a favorable B/C ratio.

### III. *Fragmented Channelization*

Plaintiff asserts that one of the most significant changes in the new proposal for channelization of Blue-Eye Creek is leaving an unchannelized segment of the creek in the middle of the channelized portions. It is in that unchannelized portion that plaintiff's lands are situated. Plaintiff contends that general hydrologic principles and experience with other channel modification

projects show clearly that the proposal will have the following adverse effects not revealed in the REIS:

▆ (A) *Downstream Flooding.* It is the admitted purpose of stream channel modification to drain surface water more rapidly off upstream lands. The waters are then directed into the widened and/or deepened channel of the creek in question. The apparent theory is to accelerate the rainfall runoff from upstream property and, if this were not true, there would be no purpose served by the channel modification. When the channel, however, is stopped prior to reaching the next largest watercourse, the accelerated flow of water will be directed onto the downstream property.

In support of that contention, plaintiff refers to a channel project completed in 1978 on Mud Creek in Cullman County. That project was of comparable nature to the proposed Blue-Eye Creek project; and it is shown, from a photograph with descriptive caption from a local newspaper submitted by plaintiff, that downstream property was being heavily flooded during a storm occurring in January of this year. In the EIS for that project, SCS stated that storms with certain frequencies of occurrence would cause flooding at a farmstead downstream from the terminal point of the channel work, thus necessitating the acquisition of land rights by the sponsors of the project and showing downstream flooding was contemplated. See also the experience in *Luxapalila* discussed above under Part I(B) and references to documentation of the adverse effects of channelization on downstream flooding in the excerpts from Dr. Folkert's affidavit.

10. See in this connection those comments of the U.S. Fish and Wildlife Service (at page 3) attached to the project work plan: "Although detrimental effects to fish stream habitat resulting from channel excavation will be minor because of negligible habitant values (a situation later questioned by the State Department of Conservation—see affidavit submitted in the previous litigation), significant damage is expected in the Blue-Eye Creek embayment of Logan Martin reservoir. . . . Increased turbidity would be temporary (a conclusion of

SCS that is contrary to the observed evidence in the excerpts from the affidavit of Dr. Folkerts submitted in this cause), but sedimentation would be of a lasting nature in reducing food production in affected areas."

11. While there is controversy over whether there will be downstream flooding of the property in the intervening unchannelized reach—see the discussion at Part III(A), *infra,* SCS has submitted no data to show that there would be no flooding below the project itself.

SCS attempts to counter the above evidence from its own and Corps of Engineers projects by an affidavit of its Alabama watershed planning staff leader to the effect that flooding of the intervening segment will not occur in the present case. Plaintiff contends that the affidavit is inconsistent with the REIS and appears to impeach itself. However, regardless of whether it is considered impeached or not, the data submitted by plaintiff that relates to other SCS projects and to projects of other agencies should be set forth in the REIS, and it is not.

(B) *Erosion of Banks from Increased Velocity Due to Downstream Channelization.* The Corps of Engineers, a sister agency of the federal defendants, in 1971 wrote architects for the planned Brookwood Mall Shopping Center in Jefferson County regarding the proposed channel modification of Shades Creek in front of that center, as follows:

> "We reiterate that the proposed channel modification could cause increased erosion and bank sloughing in the unimproved [sic] reach immediately upstream along with the deposition of sediment and increased flood flows in downstream areas."

That excerpt shows not only that there will be flooding downstream from the channel work but that there will be erosion and bank sloughing of lands upstream. The fact that upstream erosion and bank sloughing has actually taken place is shown by affidavit submitted in these proceedings that, since the channel modification was made, the width of Shades Creek in the lower reaches of Jemison Park, which are a

short distance upstream from the channel modification, has increased approximately 40–50% with the banks being substantially a perpendicular slope and having been undercut sufficiently by erosion to cause many medium and large-sized trees on the banks to have fallen. It is easily understandable from basic hydrologic principles that such an effect would occur because the downstream channelization causes an increase in velocity of water during times of heavy and even moderate rainfall and the greater amounts of water must pass with increased velocity through the upstream unchannelized segments of the stream with the resultant erosion of their banks.[12]

In an EIS, known facts must be disclosed and dealt with in an adequate manner. As stated by this Circuit in *Sierra Club v. Morton*, 510 F.2d 813 (1975), the EIS "should disclose the history of success and failure of similar projects," citing *Chicod Creek*, where inadequate treatment of erosion, sedimentation and downstream flooding were cited as among the reasons the EIS in that case was determined insufficient. Consequently, when facts contrary to the conclusions advanced by SCS are known to them or its sister agencies of the government, it is necessary to disclose them in an EIS in order for it to meet the disclosure requirements of NEPA. Otherwise, those removed from the decision-making process will have no way of knowing the adverse effects that have occurred in similar proposals.[13]

If SCS feels it can refute or explain away facts that are contrary to its conclusions, then it is free to do so; but this does not mean that it is entitled to omit those facts

---

12. In the affidavit of the SCS Alabama watershed planning staff leader, it is contended that the downstream channelization will increase the efficiency of the outlet of the unchannelized reach. That confirms the increase in water velocity but fails to consider the resultant erosion and bank sloughing referred to by the Corps.

13. These statements referred to above and in Part I are also admissible in evidence as inconsistent statements of an agent for the same principal, i. e. the U.S. Government. See *U.S. v. Santos*, 372 F.2d 177 (2d Cir. 1967), where it is stated that inconsistent out-of-court statements of a government agent made in the course of exercise of his authority and within the scope of that authority would be admissions binding upon the agent's principal in civil cases, distinguishing that result from criminal cases. Preparation of an EIS and consultation regarding similar matters are certainly within the scope of authority of the Corps of Engineers. Similarly, an EIS would be an official report admissible under rule 803 of the Federal Rules of Evidence.

from the EIS. See *Silva v. Lynn, supra,* cited favorably by this District Court in *Luxapalila,* and *Ely v. Velde, supra,* cited in this Court's previous opinion, both to the effect that an agency preparing an EIS must "explicate fully its course of inquiry, its analysis and its reasoning." None of those facts pertaining to the adverse experience regarding downstream flooding or erosion and sedimentation are, however, contained in the REIS for this project.

IV. *Violation of Downstream Riparian Rights Under State Law*

 It is the law in Alabama that an upper proprietor who collects surface water into a channel and casts or directs it upon property of the lower proprietor in greater volume or greater rapidity than would be the natural course is liable, and this is true even though there is no other outlet or drainage for the water and even though the property is located in an unincorporated area. *Kay-Noojin Development Co. v. Hackett,* 253 Ala. 588, 45 So.2d 792 (1950); see also *Southern Railway v. Lewis,* 165 Ala. 555, 51 So. 746 (1910). While there have been some conflicts in previous cases, *Kay-Noojin* appears to be the latest determination of this issue by the Alabama Supreme Court.[14] Whether downstream flooding will occur or not—see the discussion under Part III(A) above, there can be no question that upstream channelization will cast water downstream in greater volume or rapidity than would be the natural course. The Court takes judicial notice that the natural effect of such action is erosion of downstream property. That effect would not only show a violation of federal law in the form of NEPA but also the pendent claim of violation of the riparian rights of plaintiff under Alabama state law.

V. *Other Insufficiencies in Disclosures in REIS*

 NEPA is a full disclosure statute. *Calvert Cliffs Coordinating Comm. v.*

*AEC, supra; Gillham Dam, supra.* Consequently, independent of and in addition to the substantive requirements of NEPA, the REIS must meet certain disclosure tests. The Court feels that, in doing so, an EIS should at least meet requirements of the disclosure philosophy under the securities laws, which prohibit " . . . any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." See, for example, Sections 12(2) and 17(a) of the Securities Act of 1933 (full disclosure is required without any requirements of scienter, reliance or damages).

 In addition to the failure to disclose data regarding adverse experiences of downstream flooding and erosion and sedimentation from other projects set forth under Part III above, plaintiff claims that there are other insufficiencies or misrepresentations in the REIS, among which are:

(1) *Misleading Benefit/Cost Presentation.* SCS, as discussed in Part I(A), has failed, in portraying costs of the various alternatives, to use current costs for the small dams when comparing them with benefits computed at present prices. By reason of the inflationary swing thereby created, such a presentation not only upsets the required balancing of benefits and costs under NEPA but also creates a B/C presentation that is wholly misleading.

██ (2) *Erroneous Rainfall Data.* The economic data presented in the REIS is based on work of a research team whose activities are described in the affidavit of an agricultural economist filed in this cause. On Page 3 of that affidavit, it is stated:

"We also estimated from interviews (with local residents who observed the flooding) that damages from a storm occurring during March, 1973, would have approached the damages of the 1948 storm (which is referred to as the storm of record and is discussed in the REIS)

---

14. *Kay-Noojin* is even a stronger decision because there is a rule applicable in Alabama permitting obstructions to the passage of water

when in a municipality; but in *Kay-Noojin* that exception was not extended to damage from drainage from upstream properties.

had the two floodwater retarding struc-tures had not been installed." [15]

The data of the reconnaissance team is ob-viously highly speculative because, in inter-views being taken one (or four if the 1970 storm were meant) years after an event, people are being asked to estimate what would have happened at that time if the dams had not been installed and to compare that estimate with a storm 25 years earlier. Such a comparison would seem virtually impossible and would sufficiently transcend the mental capacity of even the most metic-ulous persons as to be so unreliable as to be virtually meaningless.[16] This highly specu-lative basis, on which all of the economic projections are grounded, is not set forth in the REIS and certainly is a material fact necessary in order to make the statements made in the REIS not misleading.

 (3) *Unreliable Basis for Certain Rural Benefits.* It is stated at pages 3–4 of the same affidavit, "Agronomic specialists . . . reviewed production problems re-sulting from flooding and future production plans with several farm operators whose land is located in the floodplain of Blue-Eye Creek. Interest was expressed by these farm operators to intensify production and to convert pasture land to crop production when and if flood protection is provided." It is noted, first, that those interviews were with only several farm operators (although "many" is stated on page 3 of the REIS). In addition, it is not shown that it was stated to them that the proposed flood pro-tection would be only against storms of a

frequency that occur more than once a year (i. e. the 0.75-year frequency storm). In fact, since the revised project had not yet then been formulated they could not have been told exactly what extent of flood pro-tection would be provided; and it would be unreasonable to expect changes in land use when there is such a low degree of flood protection.[17] Consequently, this informa-tion is also highly speculative, and that fact is not disclosed in the REIS.

 (4) *Inadequate Basis for Urban Benefits.* It is shown by SCS's own reports and by affidavits filed in this and the previ-ous proceedings in this cause that flooding has been substantially reduced in the Town of Lincoln and the dams are working satis-factorily. That data is, however, not con-tained in the REIS. Nevertheless, in Table 5 to the Supplemental Watershed Work Plan, which is in the REIS, urban damage reduction benefits account for $5,550 of to-tal direct damage reduction benefits of $10,200, or over 50%. It is also stated, in the SCS's affidavit, that the reconnaissance team surveyed homes in the urban area of Lincoln relative to flood damage, which, it is admitted knowledge, are located along a tributary creek extending south of the rail-road tracks leading east from the town (as shown on the project map at the end of the REIS). That tributary was proposed for channelization in the initial project, *but* it is not now. Thus, any purported alleviation of damage to those residences is largely irrelevant to the proposed project. These deficiencies in presentation of the urban

15. Contrast, should be noted with the 8.5″ rain-fall of March, 1970, reported by the SCS as not having caused any flooding damages in Lin-coln, thus indicating that the small dams are offering greater protection against heavy rain-fall than indicated in the REIS. Further, SCS, in response to plaintiff's interrogatories, did not report any rainfalls in 1973 in excess of that 1970 storm.

16. It may also be noted that since the dams and channel work were treated separately in this Court's prior order, there should be no reason for the field reconnaissance team's making a comparison with situations existing prior to construction of the dams. If SCS is trying to comply with this Court's decree, it should be analyzing need for the proposed channel work

alone so that one can make a determination of its desirability by itself. In that connection, it is noted in the affidavit (at page 6) that no separate "without" and "with" project evalua-tions were made for the channel work alone, apparently only interpolations from the figures for the dams and channel combination, which was already based on unreliable data.

17. The SCS recognizes this by the statement in the background data supplied in this case that:

"Before changed land use or more inten-sive land or restoration to former productivi-ty benefits can be claimed, an overall protec-tion level equal to the 4 to 5-year storm must be provided by the proposed alternative."

damage benefits are not disclosed in the REIS and are certainly facts necessary to make the statements made therein not misleading.

▆▆▆ (5) *Omission of Alternatives.* In this Court's initial opinion, there were set forth a number of alternatives to the channelization project that had not, at least at that time, been considered. SCS has dealt with a number of them in the REIS. However, one relating to the problem of urban housing and flooding of the same was not considered—that is the alternative of relocation through low-rent housing discussed in the Court's previous opinion at Footnote 6. SCS, as well as other agencies, is required to take into consideration in evaluating all alternatives of a project not only those it can effectuate itself but also those within the expertise of other agencies. *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (D.C. Cir. 1972), which required that alternative should not be limited to those measures the agency could adopt itself and also that they should not be disregarded "merely because they do not offer a complete solution to the problem." There is, however, no discussion in the REIS of the alternative of low-rent housing or relocation of any of the persons in the dwellings allegedly to be flooded.

▆▆ Plaintiff also has pointed out that the REIS fails to consider the alternative of stabilization of gullies—through grassing of watercourses or use of small structural measures—as an alternative. It would appear that such a stabilization program, when combined with conservation land treatment, would have less adverse effect than would channel modification; but that alternative is not discussed in the REIS although plaintiff asserts—and SCS has not denied—that it is presently employing it for other projects.

▆▆ (6) *Views of Other Agencies.* Other agencies of the federal and state governments, such as the U.S. Department of the Interior, the National Water Commission, and State Conservation Departments have opposed the practice of stream channel

modification—see, in this connection, the references in Footnote 11 to this Court's previous opinion. When the views of such agencies are well known, an EIS for stream channelization would appear to be incomplete when it fails to indicate somewhere that that practice is opposed by other governmental agencies. Plaintiffs assert that this is certainly a known factor necessary to give a full picture to others removed from the initial decision-making process when they receive a draft EIS.

The Court agrees that the above items constitute deficiencies in disclosure in the REIS and, consequently, render it inadequate under NEPA. While, as contended by defendants, the Court should not rule on competing scientific views, it is here requiring only that, first, the facts and conclusions therefrom must not be misleading and, secondly, known facts must be disclosed and dealt with in an adequate manner.

VI. *Procedural Deficiencies*

▆▆ NEPA requires a good faith objective appraisal of a project and that the environmental impact statement not merely "offer evidence of the wisdom of that (the previous) decision once it has been made." *Calvert Cliffs, supra; Daly v. Volpe,* 350 F.Supp. 252 (W.D.Wash.1972); *Montgomery v. Ellis,* 364 F.Supp. 517 at 528 (N.D.Ala. 1973). In this case, however, at the time it was decided in 1975 to proceed ahead with channelization providing a 0.75-year flood protection, which is the present proposal, several alternatives were considered. As shown by the answer to plaintiff's Interrogatory (17), none of them had a favorable B/C ratio if the dams were separated from the proposed channel work; but such separation was the treatment given in this Court's previous opinion.

Further, after the comment period, SCS, rather than changing any of the project in response to adverse comments, re-evaluated the benefits to increase them, which would make the project appear more favorable. Notwithstanding that the increased benefits still do not cause the project to meet the deficiencies discussed earlier, the Court

agrees with plaintiff that this should not be a permissible procedure under NEPA. On reflection, it obviously will serve to discourage comments from the public—and perhaps even other government agencies—that may be adverse to the project; yet, NEPA and the CEQ Guidelines promulgated under it are designed to encourage public participation in the decision-making process. One might not quarrel with an adjustment of both benefits and costs to give effect to inflation or changes in facts; but, when only the status of the same project is changed after its submission to the other governmental agencies and to the public by an increase in benefits without a similar increase in costs, the necessary comment and public participation requirements of law are being impaired. This is not the good faith compliance with the procedural requirements of NEPA that the law requires. The agency should take to the public the full facts in its draft EIS and not change them after the comment period unless, of course, the project itself is changed.

VII. *Conclusion*

Plaintiff has contended that a channelization project, such as that proposed for Blue-Eye Creek, has many adverse environmental consequences, including destruction of bottomland hardwood resources, siltation of downstream reaches of the stream, lowering of upstream water tables, and the permanent removal of a natural stream from the natural topography. For purposes of ruling on defendants' motion to dissolve the injunction in this case, however, the Court is not considering those factors that may involve disputed issues of fact. It is ruling only on those issues that are constructions of law, appear on the face of the REIS or defendants' own affidavits and reports, or involve no genuine issue of material fact to be resolved. Under such circumstances, summary judgment under Rule 56 would be appropriate and in accord with the decision of the Fifth Circuit in the *DeBardeleben v. Cummings*, 453 F.2d 320 (1972), to the effect that, although there may be arguments between the parties, if there is no dispute over the facts involved, there is no impediment to

the entry of a summary judgment. See also the decision of this District Court in *Schilleci v. Guaranty Savings Life Insurance Co.*, 367 F.Supp. 903 (1973) to similar effect.

In addition, the burden of proof in a motion to dissolve an injunction should properly fall on the movant, *U. S. v. Harrison County, Miss.*, 463 F.2d 1328 (5th Cir. 1972), in which a petitioner sought to obtain an exception to a previous injunction just as defendants in this case now seek, on basis of the REIS, to avoid application of the injunction to them. See also 7 *Moore's Federal Practice*, Sec. 60.28(3). The Court is of the opinion that defendants have failed to carry that burden of proof; but, even if the burden of proof were otherwise, plaintiff has rebutted the contentions that the injunction heretofore granted should be lifted.

As noted above, NEPA has both procedural and substantive requirements, and that is the law in this and the majority of the circuits. Accordingly, if the agency decision is determined to be arbitrary, capricious, an abuse of discretion, or, under NEPA, gives insufficient weight to environmental factors, that decision is subject to reversal by the courts. While some of the deficiencies referred to above in Parts III through VI of this opinion are primarily procedural or matters of disclosure, those discussed in Parts I and II go to the substantive decision to proceed. Under such circumstances, the courts have reversed agency decisions on the merits. Some instances are *Hughes Air Corp. v. CAB*, 482 F.2d 143 (9th Cir. 1973) (action set aside that required carry-back of losses only to instances where final airline subsidy determinations had not already been made); *Amoco v. EPA*, 177 U.S.App.D.C. 123, 543 F.2d 270 (D.C. Cir. 1976) (provision imposing liability without proof of fault for selling leaded gasoline as unleaded stricken from regulations); *Rapides General Hospital v. Matthews*, 435 F.Supp. 384 (W.D.La. 1977) (decision of review board denying medicare reimbursement for certain expenses, where most had been allowed as

**916**

reimbursable costs and there were inconsistencies between allowed and disallowed costs although the source of both expenditures was the same, was subject to summary judgment of reversal); *Pyramid Lake Paiute Indian Tribe v. Morton*, 354 F.Supp. 252 (D.C.Colo.1972) (diversion of waters flowing into Indian reservation and feeding lake as to which tribe had asserted water rights was subject to reversal for insufficient justification).

For the reasons set forth above, the REIS fails to meet both the procedural and minimum substantive requirements of NEPA to sustain action of the decision-making body; and, against those factors, it must be borne in mind that stream channel modification is virtually irreversible. In 1973 in this cause, channelization of Blue-Eye Creek was enjoined subject to certain conditions. The above discussion makes it clear that it is not possible for defendants to meet those conditions so as to permit that injunction to be lifted. Accordingly, judgment will be entered denying defendants' motions to dissolve the injunction previously issued and, since they are unable to comply with the conditions precedent to its dissolution, that injunction will be made final without conditions.